Edward W. McBride, Jr. (8236)
Jeffery J. Owens (10973)
Alyssa J. Wood (16613)
**VIAL FOTHERINGHAM LLP**
515 South 400 East, Suite 200
Salt Lake City, Utah 84111
Telephone: (801)355-9594
Facsimile:(801)359-1246
Ted.McBride@vf-law.com
Jeffery.owens@vf-law.com
Alyssa.wood@vf-law.com
*Attorneys for Plaintiffs*

---

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MARK L. SHURTLEFF, an individual; M'LISS MARLER SHURTLEFF, an individual; THOMAS JAMES SHURTLEFF, an individual; and ADRIANNA CARLINE SHURTLEFF, an individual, | **FIRST AMENDED COMPLAINT** |
|         Plaintiffs, | |
|   v. | |
| SALT LAKE COUNTY DISTRICT ATTORNEY SIM GILL, individually and in his official capacity as Salt Lake County District Attorney; SALT LAKE COUNTY; OFFICE OF SALT LAKE COUNTY DISTRICT ATTORNEY; STATE OF UTAH; UTAH DEPARTMENT OF PUBLIC SAFETY; UTAH STATE BUREAU OF INVESTIGATION; AGENT SCOTT NESBITT, an individual; UNITED STATES OF AMERICA; FEDERAL BUREAU OF INVESTIGATION (FBI); SALT LAKE PUBLIC CORRUPTION TASK FORCE; FBI SPECIAL AGENT MICHELLE PICKENS, an individual; FBI SPECIAL AGENT JON ISAKSON, an individual; and JOHN DOES 1 - 30, | Civil No.: 2:18 cv-00445 PMW<br><br>Judge: Paul M. Warner |
|         Defendants. | |

Plaintiffs Mark L. Shurtleff (hereafter "Plaintiff"), M'Liss Marler Shurtleff (hereafter M'Liss"), Thomas James Shurtleff (hereafter "Thomas"), and Adrianna Caroline Shurtleff (hereafter "Adrianna") by and through counsel, hereby complain against Defendants and each of them as follows:

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986, 1988 and the Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United State Constitution, and the case of *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

2.      Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the previously mentioned statutory and constitutional provisions.

3.      Jurisdiction supporting Plaintiffs' claim for attorney's fees is conferred by 42 U.S.C.§ 1988.

4**.**      This case is instituted in the United States Court for the District of Utah pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred.

## PARTIES

5.      At all times relevant hereto, Plaintiffs are individuals who are residents of Salt Lake County and the State of Utah.

6.      Salt Lake County District Attorney Sim Gill ("Gill") was acting at all times relevant hereto, in his individual capacity and in his official capacity as the elected District Attorney of Salt Lake County and under color of law. This Defendant is and was at all times relevant hereto, responsible for, and the chief architect of, the policies, practices and customs of

2

the Office of Salt Lake County District Attorney for the hiring, screening, training, retention, supervision, discipline, counseling and control of the Deputy County Attorneys. This Defendant is ultimately responsible for the execution and enforcement of the law within Salt Lake County. This Defendant was directly involved in orchestrating the investigation, interviewing of witnesses and ultimately in the authorization of and issuance of fraudulent and perjured search warrant affidavits; unreasonable and unlawful searches and seizures of Plaintiffs' real and personal property; unlawful assault and seizure of Plaintiff Thomas' and Adrianna's persons; and, the unlawful arrest, seizure and prosecution of Plaintiff. This Defendant was outside the role of a prosecutor, the chief architect and direct personal leader of the investigation and prosecution of Plaintiff for personal and political gain.

      7.    Defendant Salt Lake County was at all times relevant hereto a municipal entity created and authorized under the laws of the State of Utah.

      8.    Defendant Office of the Salt Lake County District Attorney was, at all times relevant herein, a municipal agency of Salt Lake County and was charged with the responsibility of working in accordance with individual constitutional rights to execute and enforce the law within Salt Lake County.

      9.    Defendant State of Utah is an appropriate defendant under 42 U.S.C. §1983, was at all times material to this Complaint the employer of Agent Scott Nesbitt.

      10.    Defendant Utah Department of Public Safety ("DPS") is a department of the State of Utah charged with the responsibility of working in accordance with constitutional rights to execute and enforce the law within the State of Utah.

11.     Defendant Utah State Bureau of Investigations ("SBI") is a division of the Utah Department of Public Safety charged with investigating crime within the State of Utah.

12.     Defendant Agent Scott Nesbitt ("Nesbitt"), is an individual who is employed by the State of Utah, at all times relevant to the Complaint was acting under color of State and Federal law as a sworn law enforcement officer in his official capacity, and in his individual capacity, as an agent assigned to SBI. During all times relevant hereto, this Defendant was appointed as a co-director of the FBI Salt Lake City Public Corruption Task Force (SLCPCTF), formed on January 13, 2014, by a Memorandum of Understanding between the FBI and SBI, and a special deputy United States Marshall appointed on July 9, 2014. Nesbitt was directly involved as the primary drafter and the issuance of fraudulent and perjured search warrant affidavits, unreasonable and unlawful searches and seizures of Plaintiff and M'Liss' real and personal property, unlawful assault and seizure of Plaintiffs Thomas' and Adrianna's persons, the unlawful arrest, seizure and prosecution of Plaintiff.

13.     Defendant United States of America is the appropriate defendant pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971) and was at all times material to this Complaint the employer of FBI Supervisory Special Agent Michelle Pickens, Special Agent Jon Isakson and Special Agents John Does

14.     Defendant Federal Bureau of Investigation ("FBI") is a federal agency of the United States with its headquarter office located in Washington D.C. with a branch office in Salt Lake County, Utah charged with the responsibility of working in accordance with constitutional rights to execute and enforce federal law within the State of Utah.

15.     Defendant FBI Salt Lake City Public Corruption Task Force ("SLCPCTF") was a joint operation created by a Memorandum of Understanding between the FBI and the Utah Department of Public Safety specifically for the investigation of Plaintiff and others whose stated purpose was to "identify and target for prosecution of federal, state, county and local public officials or public entities individuals associated with public officials or public entities and individuals representing public officials or public entities who are committing or have committed violations of federal or state criminal statutes."

16.     Defendant Supervising Special Agent Michelle Pickens ("Pickens") at all times relevant to the Complaint was acting under the color of federal law in her official capacity as special agent, and in her individual capacity, operating under the employ of the FBI and was the presumptive leader, along with Agent Scott Nesbitt, of the SLCPCTF. Pickens was directly involved in the issuance of fraudulent and perjured search warrant affidavits, unreasonable and unlawful searches and seizures of Plaintiff's and M'Liss' real and personal property, unlawful assault and seizure of Plaintiffs Thomas' and Adrianna's persons, and the unlawful arrest, seizure and prosecution of Plaintiff.

17.     Special Agent Jon Isakson ("Isakson"), at all times relevant to the Complaint was acting under the color of federal law in his official capacity as a special agent, and in his individual capacity, operating under the employ of the FBI, and was assigned to the SLCPCTF. Isakson was directly involved in the issuance of fraudulent and perjured search warrant affidavits, unreasonable and unlawful searches and seizures of Plaintiff's and M'Liss' real and personal property, unlawful assault and seizure of Plaintiffs Thomas' and Adrianna's persons, the unlawful arrest, seizure and prosecution of Plaintiff.

18.     John Does 1- 30 are unidentified law enforcement officers, and prosecutors employed by office of the Salt Lake County District Attorney, State of Utah DPS, FBI and/or SLCPCTF under color of State or Federal law in their official capacity as officers, and in their individual capacity, and directly involved in one or more of the following unlawful actions: (a) the issuance of fraudulent and perjured search warrant affidavits, (b) unreasonable and unlawful searches and seizures of Plaintiffs' real and personal property, (c) unlawful assault and seizure of Plaintiffs Thomas' and Adrianna's persons, and (d) the unlawful arrest, seizure and prosecution of Plaintiff.

## GENERAL ALLEGATIONS

### A.     POLITICALLY MOTIVATED CRIMINAL CHARGES

19.     Upon information and belief, as early as 2012, without cause, Defendants Nesbitt, Pickens, Isakson, and other members of what would become the SLCPCTF and Defendant Gill targeted Plaintiff in a politically motivated investigation related to alleged improper conduct during his tenure as Attorney General for the State of Utah.

20.     During the 2006 General Election, Republican Laura Miller defeated Defendant Democrat Sim Gill in the race for Salt Lake County District Attorney.

21.     Plaintiff supported Miller with an endorsement, radio ads, and campaign contributions.

22.     In 2010, Gill ran against Miller a second time and Plaintiff again supported her. In one radio ad Plaintiff stated his opinion that Miller was a better prosecutor than Defendant Gill.

23.     Defendant Gill won a narrow victory and within a few months of taking office, in a face-to-face meeting, Gill accused Plaintiff of lying when he said Miller was a better prosecutor, and Gill threatened Plaintiff that he would get him back.

24.     As a prequel to his 2014 re-election campaign themes, Defendant Gill introduced a new campaign theme accusing Miller of "corruption, lack of integrity, scandal, political agendas and personal vendettas," and vowed to bring back honesty and integrity and restore the public trust in the office.

25.     Defendant Gill's accusations of Miller's corruption were unsubstantiated and unfounded.

26.     In his 2014 campaign for re-election as DA, Gill was facing a tough opponent from within his office.

27.     Defendant Gill held a press conference on March 18, 2014. At the press conference, building on his success in falsely accusing Miller of corruption four years previously, he announced his campaign theme, standing before banners, and proclaimed, "Nobody is above the law" and "Restoring public trust."

28.     Prior to that press conference, Defendant Gill publicized that he was leading an investigation against Plaintiff and John Swallow (newly elected Attorney General), had executed search warrants and had arrested and charged Tim Lawson in the "scandal" created by Gill.

29.     At the press conference and throughout the remainder of the campaign, Gill used the free, "earned media" of the investigation, arrest and prosecution of Plaintiff for personal political purposes in advancing his re-election campaign.

30.     In furtherance of his campaign for re-election, Defendant Gill ordered the aggressive, fully-armed, execution of the search warrant on Plaintiffs' home notwithstanding his direct knowledge that Plaintiff was out of state.

31.     Defendant Gill ignored the standard use-of-force matrix and search warrant protocol for allegations of white collar crime and knowledge of the law-abiding and peaceful nature of Plaintiff's family. He also had his subordinates notify the news media to create a huge public spectacle to further enhance his campaign for re-election as District Attorney (DA).

32.     Similarly, on July 14, 2014, Defendant Gill ignored standard practice, and Plaintiff's offer through his attorneys, to turn himself in for booking and processing.

33.     Defendant Gill maliciously ordered the public arrest of Plaintiff at his home and notified the media of the pending arrest of Plaintiff.

34.     Defendant Gill's actions lead to sensational publicity for his re-election campaign, suggesting that he was tough on crime by public officials.

35.     After having Plaintiff arrested on camera, handcuffed and transported to jail for booking, Defendants Gill, Pickens, Isakson, and Nesbitt, and other Doe Defendants held a press conference at FBI headquarters.

36.     The DPS Commissioner began the news conference and announced that he had entered into an agreement with the FBI and had assigned an SBI investigator [Nesbitt] and staff.

37.     Defendant Gill then took the podium and read the charges and announced that he had personally "led the investigation" and for two years was in "nearly daily communication with the investigators" and with the Davis County Attorney Troy Rawlings.

38.     During the press conference Defendant Gill maliciously repeated the false, empty statements in the search and arrest warrant affidavits (outlined in the preceding paragraphs).

39.     On July 15, 2014, formal charges were filed in the Third District Court, Salt Lake County against Plaintiff.

40.     According to the Information filed with the Court, Plaintiff was charged with Ten Criminal Counts, including:

Count 1. PATTERN OF UNLAWFUL ACTIVITY, 76-10-1603, a Second Degree Felony, as follows: That on or about January 08, 2009 through May 6, 2013, in Salt Lake County, State of Utah, the defendant, as a party to the offices, (a) having received any proceeds derived, whether directly or indirectly, from a pattern of unlawful activity in which the defendant had participated as a principal, did use or invest, directly or indirectly, any part of that income, or the proceeds of the income, or the proceeds derived from the investment or use of those proceeds, in the acquisition of any interest in, or the .establishment or operation of, any enterprise; (b) through a pattern of unlawful activity, acquire or maintain, directly, or indirectly, any interest in or control of any enterprise;

Count 2. RECEIVING OR SOLICITING A BRIBE, 76-8-105 UCA, a Second Degree Felony, as follows: that on or about May 04, 2009 through May 5, 2009, in Salt Lake County, State of Utah, the defendant, as a party to the offense, did ask for, solicit, accept, or receive, directly or indirectly, a benefit with the understanding or agreement that the purpose or intent was to influence an action, decision, opinion, recommendation, judgment, vote, nomination, or exercise of discretion, of a public service, party official, or voter and the value of the benefit asked for, solicited, accepted, or conferred exceeded $1,000.

Count 3. RECEIVING OR SOLICITING A BRIBE, 76-8-105 UCA, a Second Degree Felony, as follows: That on or about June 05, 2009 through June 7, 2009, in Salt Lake County, State of Utah, the defendant, as a party to the offense, did ask for, solicit, accept, or receive, directly or indirectly, a benefit with the understanding or agreement that the purpose or intent was to influence an action, decision, opinion, recommendation, judgment, vote, nomination, or exercise of discretion, of a public servant, party official, or voter and the value of the benefit asked for, solicited, accepted, or conferred exceeded $1,000.

Count 4. RECEIVING OR SOLICITING A BRIBE, 76-8-105 UCA, Second Degree Felony, as follows: That on or about October 31, 2008 through January 08, 2009, in Salt Lake County, State of Utah, the defendant, as a party to the offense, did ask for, solicit, accept, or receive, directly or indirectly, a benefit with the understanding or

9

agreement that the purpose or intent was to influence an action, decision, opinion, recommendation, judgment, vote, nomination, or exercise of discretion, of a public servant, party official, or voter and the value of the benefit asked for, solicited, accepted, or conferred exceeded $1,000.

Count 5. ACCEPTING A GIFT, 67-16-5 UCA, a Second Degree Felony, as follows: That in or about February, 2011, in Salt Lake County, State of Utah, the defendant, as a party to the offense, and as a public officer or public employee, under circumstances not amounting to a violation of Utah Code §§ 63G-6-1001 or 76-8-105, did knowingly and intentionally receive, accept, take, seek, or solicit, directly or indirectly for himself or another a gift of substantial value or a substantial economic benefit tantamount to a gift:
(1)(a) that would tend improperly to influence a reasonable person in the person's position to depart from the faithful and impartial discharge of the person's public duties;
(b) that the person knew or that a reasonable person in that position should know under the circumstances was primarily for the purpose of rewarding the person for official action taken; or
(c) if he recently had been, is now, or in the near future may be involved in any governmental action directly affecting the donor or lender; and
(2) the total value of the compensation, conflict of interest, or assistance exceeded $1,000.

Count 6. ACCEPTING A GIFT, 67-16-5 UCA, a Second Degree Felony, as follows: That on or about January 01, 2009 through May 1, 2010, in Salt Lake County, State of Utah, the defendant, as a party to the offense, and as a public officer or public employee, under circumstances not amounting to a violation of Utah Code §§ 63G-6-1001 or 76-8-105, did knowingly and intentionally receive, accept, take, seek, or solicit, directly or indirectly for himself or another a gift of substantial value or a substantial economic benefit tantamount to a gift:
(1)(a) that would tend improperly to influence a reasonable person in the person's position to depart from the faithful and impartial discharge of the person's public duties;
(b) that the person knew or that a reasonable person in that position should know under the circumstances was primarily for the purpose of rewarding the person for official action taken; or
(c) if he recently had been, is now, or in the near future may be involved in any governmental action directly affecting the donor or lender; and
(2) the total value of the compensation, conflict of interest, or assistance exceeded $1,000.

Count 7. ACCEPTING EMPLOYMENT THAT WOULD IMPAIR JUDGEMENT, 67-16-4 UCA, a Second Degree Felony, as follows: That in or about September 2012 through May 2013, in Salt Lake County, State of Utah, the defendant as a party to the offense, and as a public officer, public employee, or legislator, under

circumstances not amounting to a violation of Utah Code Ann. §§ 63G-6-1001 or 76-8-105, did

(1)(a) accept employment or engage in any business or professional activity that he might reasonably expect would require or induce him to improperly disclose controlled information that he had gained by reason of his official position;

(b) disclose or improperly use controlled, private, or protected information acquired by reason of his official position or in the course of official duties in order to further substantially the officer's
or employee's personal economic interest or to secure special privileges or exemptions for himself or others;

(c) use or attempt to use his official position to:

(i) further substantially the officer's or employee's personal economic interest; or

(ii) secure special privileges or exemptions for himself or others;

(d) accept other employment that he might expect would impair his independence of judgment in the performance of his public duties; or

(e) accept other employment that he might expect would interfere with the ethical performance of his public duties; and

(2) the total value of the compensation, conflict of interest or assistance exceeded $1,000.

Count 8. TAMPERING WITH A WITNESS, 76-8-508(1) UCA, Third Degree Felony, as follows: That on or about May 08, 2009 at 10470 South State Street, in Salt Lake County, State of Utah, the defendant as a party to the offense, believing that an official proceeding or investigation was pending or about to be instituted, or with the intent to prevent an official proceeding or investigation, did attempt to induce or otherwise cause another person to:

(a) testify or inform falsely;

(b) withhold any testimony, information, document, or item;

(c) elude legal process summoning him to provide evidence; or

(d) absent himself from any proceeding or investigation to which he has been summoned.

Count 9. TAMPERING WITH EVIDENCE, 76-8-510.5 UCA, a Third Degree Felony, as follows: That in or about February 2012 at 2020 East Candle Spruce Cove, in Salt Lake County, State of Utah, the defendant, as a party to the offense, did knowingly or intentionally, in conjunction with an official proceeding, believing that an official proceeding or investigation was pending or was about to be instituted, or with the intent to prevent an official proceeding or investigation, or to prevent the production of any thing or item which reasonably would be anticipated to be evidence in the official proceeding or investigation,

(a) alter, destroy, conceal, or remove any thing or item with the purpose of impairing the veracity or availability of the thing or item in the proceeding or investigation; or

(b) make, present, or use any thing or item which he knew to be false with the purpose of deceiving a public servant or any other party who was or may have been engaged in the proceeding or investigation.

Count 10. OBSTRUCTING JUSTICE, 76-8-306(1) UCA, Third Degree Felony, as follows: That on or about May 06, 2013 at 5425 West Amelia Earhart Drive, in Salt Lake County, State of Utah, the defendant as a party to the offense, with intent to hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person regarding conduct that constituted a criminal offense, did
(1)(a) provide any person with a weapon;
(b) prevent by force, intimidation, or deception, any person from performing any act that might aid in the discovery, apprehension, prosecution, conviction, or punishment of any person;
(c) alter, destroy, conceal, or remove any item or other thing;
(d) make, present, or use any item or thing known by the actor to be false;
(e) harbor or conceal a person;
(f) provide a person with transportation, disguise, or other means of avoiding discovery or apprehension;
(g) warn any person of impending discovery or apprehension;
(h) warn any person of an order authorizing the interception of wire communications or of a pending application for an order authorizing the interception of wire communications;
(i) conceal information that was not privileged and that concerned the offense, after a judge or magistrate had ordered the actor to provide the information; or
(j) provide false information regarding a suspect, a witness, the conduct constituting an offense, or any other material aspect of the investigation; and
(2)(a) the conduct that constituted a criminal offense would be a second or third degree felony and the defendant violated Subsection (1)(b), (c), (d), (e), or (f);
(b) the conduct that constitutes a criminal offense would be any offense other than a capital or first degree felony and the actor violated Subsection (1)(a);
(c) the obstruction of justice was presented or committed before a court of law; or
(d) it was a violation of Subsection (1)(h).

41.     Defendants deliberately selected isolated evidence and statements deliberately designed to distort the truth for the purpose of injuring Plaintiffs.

42.     The most obvious example of Defendants' deliberate misuse of information is the evidence gathered in a sting operation in which Plaintiff was a confidential informant in an FBI investigation (See Part F below). Defendants knowingly took only selected information and withheld information regarding Plaintiff's participation in an FBI sting operation to manipulate the Court into issuing the warrants and criminal charges. Without this distorted information, the Court would likely never have authorized any warrants against Plaintiffs.

43.     On May 6, 2013, Plaintiff submitted to a voluntary interview at the FBI's Salt Lake City Office with Special Agent Jon Isakson, Special Agent Crystal Bowen, and Assistant United States Attorney Ed Sullivan, who was participating on behalf of the Department of Justice, Criminal Division, Public Integrity Section (commonly referred to as "PIN"). During the interview Plaintiff was asked about all instances which later showed up in the original criminal information filed against him by Defendant Gill.

44.     After nearly a year-long investigation into allegations of bribery and "fraud schemes" involving Plaintiff, conducting several other interviews, and reviewing all evidence, the Department of Justice concluded that there was not probable cause to charge Plaintiff.

45.     On September 13, 2013, DOJ PIN Chief Jack Smith sent a letter to Special Agent in Charge of the Salt Lake Office of the FBI, Mary Francis Rook, stating that they were declining to prosecute Plaintiff, closing their investigation and file, and confirming that the Salt Lake Office of the FBI agreed with that decision.

46.     No new relevant evidence was developed subsequent to PIN's decision to not bring criminal charges that was used as a basis for the criminal information subsequently filed against Plaintiff by Salt Lake County District

47.     In or about 2013, Troy Rawlings was the County Attorney for Davis County. Mr. Rawlings had served in that position for 7 years.

48.     Mr. Rawlings, a Republican elected official, was involved in the investigation of Plaintiff's case, and was used by Defendant Gill as "political cover" so Gill could claim that his investigation was not political.

49.     In or about November 2014, after Defendant Gill narrowly won re-election as Salt Lake District Attorney, Mr. Rawlings was made a Special Assistant Attorney General by Utah Attorney General Sean Reyes and was given full jurisdictional and decision-making authority as the chief prosecutor of the charges against Plaintiff Mark Shurtleff.

50.     Mr. Rawlings immediately dismissed Count 1 of the Information having determined that there was no probable cause or basis for Count 1. In June 2015, Mr. Rawlings further determined that the evidence did not support a number of the original charges brought against Plaintiff and filed an Amended Information.

51.     By July 18, 2016, Mr. Rawlings determined that there was no probable cause for any of the charges brought against Plaintiff, that there was never probable cause, and that Plaintiff was in fact innocent of all charges.

52.     Mr. Rawlings will testify that over Defendant Gill's, Picken's, Isakson's, and Nesbitt's objections and direct threats, Mr. Rawlings determined that justice required dismissal of all charges against Plaintiff Mark Shurtleff. As a result, he did not file oppositions to Plaintiff's motions to dismiss all criminal charges.

53.     On July 18, 2016, Mr. Rawlings filed a Motion to Dismiss the Amended Information requesting the Court to dismiss the remainder of the case based on (1) Cooperation Agreement; (2) *McDonnell v. United States*, 579 U.S. _____ (2016); (3) Speedy trial; (4) Insufficient Evidence; and (5) Prejudicial Publicity.

54.     The Court ordered the dismissal of Case No. 141907720 on July 28, 2016.

55.     Mr. Rawlings will testify that if he had known of the falsified affidavits and the truth about other "evidence" that the State of Utah purportedly had, he would have never allowed the criminal case to be filed against Plaintiff.

56.     Mr. Rawlings will testify that Defendant Gill and other defendants violated Plaintiff's constitutional rights.

57.     Mr. Rawlings will testify that Defendant Gill indicated to him that his decision to dismiss the case against Plaintiff would end his political career.

58.     Plaintiff incurred approximately $1.2 million in attorney fees to defend these charges brought against him. Defendants' malicious and unlawful prosecution of Plaintiff has caused Plaintiff financial loss and emotional stress and distress.

**B.      UNLAWFUL SEARCH WARRANT**

59.     Between December 2013 and June 2, 2014, Defendants Nesbitt, Pickens, Isakson and other members of the SLCPCTF worked with Defendant Gill and with other possible County Defendants to prepare and submit a series of warrant applications to the Honorable Vernice S. Trease in the Third District Court, State of Utah requesting search warrants for Plaintiff's emails and personal residence.

60.     On or about December 11, 2013, Defendants Pickens, Isakson and Nesbitt prepared an application for a search warrant.

61.     Defendant Nesbitt signed the search warrant application under oath and Nicholas D'Alesandro of the Salt Lake County Attorney's office approved the application at Defendant Gill's direction.

62.     Defendants Nesbitt, Pickens, Isakson, and others of the SLCPCTF knowingly

used false, manipulated, and distorted information throughout the affidavit submitted to the Magistrate. In fact, Nesbitt swore in a July 5, 2016 affidavit filed with the court that "All of the affidavits were reviewed for accuracy by Special Agent Isakson, Special Agent Ulsh, and or Supervisory Special Agent Pickens prior to them being submitted to prosecutors for approval."

63.     Defendants Nesbitt, Pickens, Isakson and others of the SLCPCTF knew of the prior decision by the FBI and U.S. Department of Justice declining to prosecute Plaintiff, closing their investigation and file, and confirming that the Salt Lake Office of the FBI agreed with that decision.

64.     Defendant Gill and others of his office knew the affidavit and warrant contained false, distorted and misleading information and that the investigation itself was unnecessary and nevertheless signed off on and approved it for submission to the Magistrate.

65.     On December 11, 2013, relying on the SLCPCTF agent's false representations and the validation of Defendant Gill and other County attorneys, Judge Trease issued search warrant 216 permitting seizure of a broad range of documents from Google, Inc. and Google Payments Corporation, including communications sent and received from Plaintiff's personal email account for a four-year period.

66.     On or about June 2, 2014, Defendants Pickens, Isakson, and Nesbitt prepared an application for another search warrant against Plaintiff.

67.     Defendant Nesbitt signed the warrant application under oath and Fred Burmester of the Salt Lake County Attorney's office approved the application at Defendant Gill's direction.

68.     Defendants Nesbitt, Pickens, Isakson, and others of the SLCPCTF knowingly used information that had been manipulated and distorted throughout the affidavit submitted to

the Magistrate.

69.     Upon information and belief, when preparing and submitting the search warrant affidavits, Defendant Nesbitt relied on statements and information provided by members and contributors to SLCPCTF from their investigative work. In fact, Nesbitt swore in a July 5th, 2016 affidavit filed with the court that "All of the affidavits were reviewed for accuracy by Special Agent Isakson, Special Agent Ulsh, and or Supervisory Special Agent Pickens prior to them being submitted to prosecutors for approval."

70.     As explained further below, Defendant Gill and others of his office knew the affidavit and warrant contained false, distorted and misleading information and nevertheless signed off on and approved it for submission to the Magistrate.

71.     If the Court had the correct and complete information submitted in support of the search warrant, it would never have issued the search warrant.

72.     On June 3, 2014, relying on Defendant Nesbitt's false representation and the validation of Gill and other County attorneys, Judge Trease issued search warrant 158 permitting search and seizure of a broad range of documents and things from Plaintiffs' private residence.

73.     The search warrant affidavit is carefully written and calculated in such a way as to emphasize innocuous details of various transactions/events to suggest or create the appearance that Plaintiff was corrupt.

74.     None of the transactions/events described in the search warrant affidavit provide any basis for probable cause for the search warrant.

75.     On or about June 3, 2014, Defendant Pickens, with the direct assistance of Defendant Nesbitt and Isakson, organized and led a combined search warrant execution and

search teams made up of other members of the SLCPCTF and other law enforcement officers from the FBI, DPS and SBI, including John Doe Defendants.

76.    Upon information and belief, SLCPCTF members including Defendants Nesbitt, Pickens, and Isakson, had been surveilling Plaintiff and his family for several weeks prior to June 3, 2014.

77.    Prior to, and during the execution of the search warrant on Plaintiff's private residence, Plaintiff's defense attorneys had personally informed Defendant Gill and others of his office, that Plaintiff was in Washington D.C. working and not at home.

78.    Upon information and belief, as a result of the notification from Plaintiff's attorneys and from surveillance of Plaintiff, Defendants Pickens, Nesbitt, and Isakson also knew that Plaintiff and M'Liss were not at the residence on June 3, 2014, and that the only persons in residence were their two children, Plaintiffs Thomas and Adrianna (a minor).

79.    On June 3, 2014, without cause, under the direction of Defendants Pickens, Nesbitt, Isakson, members of the SLCPCTF and other law enforcement officers from the FBI, DPS and SBI, including John Does, entered Plaintiffs' home with excessive force, including wielding deadly force, wearing body armor, and with drawn firearms including assault rifles and other automatic and semi-automatic weapons.

80.    The allegations against Plaintiff were not violent in nature and did not require the use of force in the execution of the warrants.

81.    Without cause and with malice, these Defendants threatened, seized, searched, and physically, verbally and emotionally abused Plaintiffs Thomas and Adrianna.

82.     Defendant Pickens, with the direct assistance of Nesbitt and Isakson, and other members of the SLCPCTF and other law enforcement officers from the FBI, DPS and SBI, including John Does, seized personal property belonging to Plaintiff M'Liss, specifically her therapeutic journal, which item was not property identified in the affidavits submitted to the Court and was not related to the investigation being conducted on Plaintiff.

83.     The actions of the Defendants in the execution of SWA 216 and 158, were unlawful and malicious and in violation of the civil rights of the Plaintiffs.

84.     Defendant Gill exceeded his authority and ignored established protocols in ordering the aggressive, fully-armed, execution of the search warrant on Plaintiffs' home notwithstanding his knowledge that Plaintiff Mark Shurtleff and M'Liss were not at home.

85.     Defendants Gill, Nesbitt, Pickens and Isakson ignored standard use of force protocols for the execution of the search warrants for allegations of white collar crime, and in fact ignored their own use of force matrix prepared for the search on Plaintiffs' home.

86.     Many of Defendant Gill's actions exceeded his authority as Salt Lake County District Attorney.

87.     Defendant Gill, and/or his subordinates at his direction, notified select individuals in the media of the execution of the search warrant for maximum public effect.

88.     Defendant Gill's public statements were defamatory and injurious to Plaintiff's reputation.

89.     Defendant Gill's coordination of the media exposure surrounding the arrest were choreographed through a single media outlet of which he had some influence.

90.     The following actions by Defendant Gill were designed to injure Plaintiff and were for personal gain:

       a.      Defendant Gill's comments to the public regarding the case were knowingly false;

       b.      Defendant Gill knew that the comments were false because he led and personally participated in the investigation of the criminal charges and interviewed witnesses;

       c.      Defendant Gill authorized investigators to misrepresent material facts; and

       d.      Defendant Gill's comments to the public were designed to enhance and promote his 2014 re-election campaign for District Attorney using his unlawful investigation and malicious prosecution of Plaintiff for free "earned media" in support of his campaign slogan: "Nobody is Above the Law"

91.     Defendant Gill's comments to the press were made in connection with the illegal and unconstitutional arrest and prosecution of Plaintiff.

92.     Gill's public comments were designed to gain unfair trial advantage by creating a false public narrative and taint the entire potential jury pool in Salt Lake County.

93.     Each of the Plaintiffs suffered severe, permanent emotional distress and harm as a result of the unlawful actions of each of the Defendants, including, but not limited to, unreasonable fear at the sound of someone knocking on their door, depression, panic attacks, and unreasonable fear of police officers.

94.     Plaintiffs have been irreparably and permanently harmed as a result of the malicious and unlawful actions of Defendants.

95.     Each of the Plaintiffs have sustained psychological and emotional injuries and has, or will in the future, incur expenses for that treatment.

96.     Plaintiffs have incurred an excess of $1,000,000 in attorney fees and thousands more in counseling and treatment fees and each of them continue to suffer financial and emotional stress as a result of the unlawful and malicious actions of each of the Defendants.

97.     Troy Rawlings will testify that if he had known all of the falsified and misleading information that the criminal case and search warrants were based on, he would have never filed it in the first place.

### C.     ARREST WARRANT

98.     On or about July 13, 2016, Defendants Nesbitt and Isakson, and others in conspiracy with them, including Defendant Gill, prepared an information based upon a written, sworn Declaration of Probable Cause by Nesbitt, for an arrest warrant against Plaintiff.

99.     The matter was screened by Defendant Gill and authorized for presentment and filing by Defendant Gill and Davis County District Attorney Troy Rawlings.

100.     Defendant Gill knew that the declaration signed by Defendant Nesbitt contained selected evidence and misleading statements and nevertheless approved it for submission to the Magistrate Judge.

101.     Rawlings did not know, and Defendant Gill did not inform him, of the intentionally selective use of evidence and the misleading statements used for purposes of obtaining an arrest warrant.

102.    On June 13, 2014, relying on Defendant Nesbitt's false representation and the validation of Defendant Gill and other County attorneys, Judge Trease issued an arrest warrant for Plaintiff's arrest.

103.    Plaintiff was aware that an arrest warrant was imminent and his counsel contacted Defendant Gill and offered to accompany Plaintiff to turn himself in for booking and processing at the Salt Lake County Jail.

104.    Instead, Defendant Gill, acting outside the scope of his authority, with malice and without a legitimate purpose, ordered the public arrest of Plaintiff at his home for his own personal political reasons.

105.    For purposes of public embarrassment and scrutiny and for his own personal reasons, Defendant Nesbitt contacted his sister-in-law, Heidi Hatch, a reporter with KUTV news in Salt Lake City and leaked information to her about the timing of Plaintiff's arrest.

106.    A KUTV2 News cameraman was seen by Plaintiffs' neighbors "lurking" in the bushes and waiting for the arrest warrant to be served on the morning of July 14, 2014, so that he could publicly cover the event to embarrass Plaintiff. That cameraman later admitted to at least one colleague that he had been instructed by Heidi Hatch to be at the Plaintiffs' home for purposes of filming the arrest.

107.    On July 14, 2014, Plaintiff was arrested on false charges as outlined in paragraph 40 above, transported to jail, booked and processed. Plaintiff was subsequently released to Pretrial Services later that day.

108.    Mr. Rawlings will testify that if he had been aware of the misuse and selective use of information and malicious nature of the charges filed against Plaintiff, he would never have

filed them in the first place, no search warrants would have been issued and no arrest warrant issued.

109.    As a result of the malicious and false charges filed against him, Plaintiff's reputation has been irrevocably harmed.

110.    As a result, Plaintiff lost employment opportunities. Plaintiff suffered the immediate loss of his personal income and his income continues to be impacted severely.

    **D.**    **IN VIOLATION OF UTAH LAW AND IGNORING PLAINTIFF'S RIGHTS, DEFENDANTS NAMED JOHN SWALLOW AND MARK SHURTLEFF IN THE SAME CHARGING DOCUMENTS WITH THE SAME CASE NUMBER**

111.    The criminal case filed against Plaintiff Mark Shurtleff included a co-defendant, John Edward Swallow.

112.    Initially, John Swallow and Mark Shurtleff were charged in *separate* Informations with *separate* counts pursuant to *separate* Declarations of Probable Cause alleging *separate* facts all under *separate* case numbers, but on each Information they were listed as co-defendants.

113.    None of the allegations against John Swallow and Mark Shurtleff allege that Shurtleff and Swallow participated in the same act or conduct or in the same criminal episode.

114.    The State never moved to consolidate the cases yet named John Swallow as a co-defendant in Plaintiff's case.

115.    The cases were never joined for any purpose other than Defendant Gill's improper purpose to create the public sensationalism of "scandal" to promote his own personal political ambitions and re-election campaign.

116.    On September 4, 2014, Plaintiff's attorneys filed a *Motion to Verify that the Shurtleff Case has not been Consolidated with the Earlier Filed Swallow Case (and to Strike from the Caption the Characterization of Mr. Swallow as Mr. Shurtleff's Co-Defendant).*

117.    On October 17, 2014, Defendants, under the direction and instruction of Defendant Gill, filed a response to Plaintiff's *Motion* knowing that the charges against Plaintiff were based on misinformation and mischaracterization of evidence.

118.    As a political and sensational ploy to gain public attention to Plaintiff's detriment, and despite knowing that the two criminal cases were in fact separate, and there was never a factual or legal basis to join the two cases, Defendant Gill and others in his office insisted that the two cases were one and the same, as a political and sensational ploy to gain public attention to Plaintiff's detriment.

119.    Defendants' purpose in naming Plaintiff with John Swallow was to defame Plaintiff, to sensationalize the case in the public eye, enhance Gill's re-election chances, and to cause Plaintiff harm.

120.    Defendant Gill's action in naming John Swallow as a co-defendant did not serve any legitimate basis in the underlying criminal case. Gill directed and authorized the inclusion of John Swallow in the Shurtleff matter for the sole purpose of enhancing his re-election chances and of harming Plaintiff.

121.    As a result of the malicious and sensationalized use of both names as co-defendants, Plaintiff has suffered irrevocable harm to his reputation and financial stability.

**E.      COUNT 1 OF THE CRIMINAL CHARGES, PATTERN OF UNLAWFUL ACTIVITY ARE RELATED TO PLAINTIFF'S ROLE IN MARC S. JENSON'S CRIMINAL PROSECUTION IN 2005-2008.**

122.    In 2005, as Attorney General for the State of Utah, Plaintiff participated in a criminal matter involving Marc S. Jenson.

123.    On August 10, 2005, Plaintiff as the Utah Attorney General charged Marc Jenson with several fraud-related crimes for acts committed in 2000.

124.    Throughout the criminal case, several prominent members of the community including elected officials and at least one LDS church official attempted to use political influence and personal pressure on Plaintiff in the hopes of securing a dismissal of the charges against Mr. Jenson.

125.    Plaintiff participated in Mr. Jenson's prosecution at early stages of the criminal case, in part because the case involved serious allegations and millions of dollars in restitution and in part because some of Mr. Jenson's victims first lodged their complaints with Plaintiff.

126.    Individuals who attempted to influence the criminal prosecution of Mr. Jenson, among others, included Tim Lawson, friends and former fundraisers, several members of Mr. Jenson's family, Jenson employees and Mr. Jenson himself.

127.    At one point, Mr. Jenson's Director of Security for a project coined as the Mount Holly development project (a project for a private ski and golf resort being developed by Marc Jenson and his brother Stephen Jenson), Paul Nelson, who also invested in Mr. Jenson's business, contacted victims in the pending criminal case for the purpose of interfering with the investigation and prosecution.

128.    Mr. Nelson also sent several emails to Plaintiff, insisting on Mr. Jenson's innocence and requesting dismissal of charges.

129.    Tim Lawson attempted to influence Plaintiff by outlining terms of a proposed plea deal.

130.    Charlene Barlow, Kirk Torgensen, and Scott Reed, among others in Plaintiff's office, participated in the evaluation of the case, its prosecution, and plea negotiations.

131.    Part of the responsibilities of the Attorney General's office is to enter into plea arrangements with Defendants.

132.    Several of the witnesses in Marc Jenson's case did not have "clean hands" and their credibility was impeachable.

133.    The prosecutors were aware of the strengths and weaknesses of the case.

134.    Plea negotiations were ongoing between Mr. Jenson's attorney, Barlow, Torgensen, and Reed.

135.    Mr. Reed presented a plea in abeyance offer to Mr. Jenson's attorney that did not require payment of restitution. Mr. Reed confirmed that this offer was not sanctioned by Plaintiff.

136.    Plaintiff Mark Shurtleff rejected the deal and insisted on full restitution to Mr. Jenson's victims and jail time if not paid within a three year period of time.

137.    Mr. Reed's initial offer for a plea in abeyance and no restitution was rejected by the Judge presiding over Mr. Jenson's case.

138.    A second plea in abeyance was negotiated on this case between Mr. Reed and Mr. Jenson's attorney, in which Mr. Jenson agreed to pay full restitution of $4,100,000.

139.    After agreeing to the terms of the plea in abeyance, Mr. Jenson pled no contest to the charges on May 29, 2008.

140.    Without any basis in fact or evidence, or even logic, each of the individual Defendants distorted facts and falsely accused Plaintiff of accepting some sort of bribe from Mr. Jenson or his representatives in order to secure a plea in abeyance.

141.    Mr. Jenson failed to pay any restitution over the next three years.

142.    Mr. Jenson was sentenced for up to ten years in State Prison for failing to abide by the terms of the plea deal.

143.    Subsequent to a failed board of pardons hearing for Mr. Jenson in 2012, Mr. Jenson was recorded talking about a plan to get revenge on Plaintiff.

144.    Charlene Barlow was interviewed by Defendants during their investigation of Plaintiff.

145.    During plea negotiations, Ms. Barlow informed other prosecutors that she was unwilling to offer a plea in abeyance. Ms. Barlow, however, indicated to Defendants that she "did not think it was unethical that [Mr.] Shurtleff wanted a plea in abeyance instead of a trial."

146.    Ms. Barlow further indicated to Defendants that witnesses in Mr. Jenson's criminal case "were not the best possible witnesses since they were 'shady,' but that was common for victims in this type of case."

147.    Defendants Nesbitt, Pickens, and Isakson represented in search warrant affidavits that Ms. Barlow had "heard rumors" that Marc Jenson offered to help Plaintiff with his election if Plaintiff would make the case go away.

148.    Defendants Nesbitt, Pickens, and Isakson allege that Ms. Barlow strongly objected to a plea in abeyance plan for Marc Jenson and insinuated that the plea in abeyance was being offered as part of a quid pro quo deal.

149.    Defendants exploited an interview with Ms. Barlow's and her indication that she didn't like the deal which started the relentless pursuit of the baseless criminal charges against Plaintiff.

150.    The principal basis on which the Defendants relied which spearheaded the investigation of Plaintiff is information obtained from Marc S. Jenson.

151.    Defendants interviewed Marc Jenson numerous times in relation to their investigation of Plaintiff.

152.    Defendants accepted Jenson's "story" as absolute truth, even though Jenson could not articulate or offer any evidence of a quid pro quo.

153.    In one interview with Defendants, Jenson claimed that Plaintiff gave him blanket immunity, in perpetuity, within the State of Utah if he [Jenson] would contribute to his campaign.

154.    Despite the fact that Plaintiff was the top law enforcement official in the State of Utah at that time, with an unimpeached record, Defendants never went to Plaintiff and asked him to respond to Jenson's fantastical, sensational claims of blanket immunity in perpetuity.

155.    Defendants believed Marc Jenson when he made the claim that Plaintiff had the power and ability to give him blanket immunity within the State of Utah in perpetuity.

156.    Plaintiff fully disclosed the plea offer to Defendant Pickens of the FBI, along with an explanation of why the Attorney General's office extended a plea in abeyance for three years that required payment of full restitution to Mr. Jenson's victims.

157.     Defendants Nesbitt with the knowledge and assent of Pickens and Isakson, and in collaboration with Gill and others in his office, knowingly and maliciously misrepresented the

facts and circumstances surrounding negotiation of the plea deal by inaccurately attributing the terms and language of the plea in abeyance to Plaintiff and failing to disclose that Plaintiff insisted that full restitution be paid to victims throughout the course of negotiations.

158.   There was nothing inappropriate about how the plea deal was handled. When Barlow complained about the terms of the deal to the task force, they seized on the opportunity to turn what was nothing more than some disagreement over a prosecutor's discretion into a criminal witch hunt. They purported to believe Marc Jenson despite knowing that in fact he wasn't telling the truth.

### F.   GILL, PICKENS, ISAKSON AND NESBITT MISCONSTRUED EVIDENCE GATHERED IN A STING OPERATION IN WHICH PLAINTIFF WAS A CONFIDENTIAL INFORMANT IN AN FBI INVESTIGATION.

159.   Plaintiff acted as a confidential informant in an FBI investigation involving Paul Nelson, an affiliate of Marc Jenson.

160.   In September 2007, Plaintiff was hospitalized for injuries that he received in a serious motorcycle accident. Paul Nelson visited Plaintiff's hospital room. Finding Plaintiff heavily sedated, Mr. Nelson informed Plaintiff that Marc Jenson and his friends could raise hundreds of thousands if not a million dollars in campaign contributions if Plaintiff would dismiss the charges against Mr. Jenson.

161.   Mr. Nelson threatened Plaintiff's political future if he failed to dismiss Mr. Jenson's case. Specifically, Mr. Nelson indicated that Mr. Jenson's investors in New York would raise money against Plaintiff in the 2008 election, and that Mr. Greg Skordas (Mr. Jenson's attorney) and Scott Reed, a prosecutor assigned to the case, were conspiring to "mount a campaign" against Plaintiff if the charges were not dismissed.

162.     Shortly after Mr. Nelson's visit, Plaintiff reported Mr. Nelson's attempt to bribe and coerce him to the FBI through his Chief of Investigation, Ken Wallentine.

163.     After Plaintiff reported Mr. Nelson's attempt to improperly influence him in the hospital, the United States Attorney's Office for the District of Utah and the FBI opened a formal criminal investigation of Mr. Nelson and Mr. Jenson that included potential federal charges of Bribery of a Public Official, Interstate Communications, and Wire Fraud.

164.      Defendant Pickens was assigned to lead that investigation, communicating frequently with Plaintiff.

165.     The FBI, Pickins and Assistant United States Attorney Barbara Bearnson instructed Plaintiff to initiate further communications between Plaintiff and Mr. Nelson and that those communications be recorded.

166.     Plaintiff participated as he was instructed by Defendant Pickens as the FBI's confidential informant in a sting operation that resulted in two recorded meetings and the collection of more than 140 text messages.

167.     As part of the sting operation, Plaintiff provided the FBI with text messages between Plaintiff, Mr. Nelson, Mr. Jenson, and Mr. Skordas. Plaintiff also sent several text messages to Mr. Nelson, Mr. Jenson, and Mr. Skordas with the full knowledge and, at times, direction of the FBI, specifically Defendant Pickens.

168.     The text messages, sent when Plaintiff was acting as a confidential witness, were used in Defendants' applications for the search and arrest warrants.

169.    Defendants Gill, Nesbitt, Pickens and Isakson falsely and maliciously alleged that Plaintiff was complicit in Mr. Jenson's scheme in expressing a willingness to accept money or avoid threats made against him in exchange for dismissal of criminal charges.

170.    Far from being complicit in Mr. Jenson's scheme, Plaintiff was not involved in any criminal activity with Mr. Jenson.

171.    Instead, Plaintiff actively informed authorities of unlawful efforts to improperly influence a pending criminal case and then played a critical role as a confidential informant in the subsequent investigation.

172.    In the search warrant application, Defendant Nesbitt, with the assistance of Pickens and Isakson, outlined the fact that there were recordings between Paul Nelson and Plaintiff.

173.    Defendant Nesbitt highlighted the fact that in the recordings, Paul Nelson had offered Plaintiff campaign contributions in excess of $500,000 in the course of three months in exchange for Plaintiff's dismissal of the charges against Marc Jenson.

174.    Defendant Nesbitt did not attribute any of the recordings to what they were - - Plaintiff, as a confidential informant working at the request of the FBI to gather evidence against Paul Nelson and Marc Jensen.

175.    Defendant Nesbitt failed to inform the Court that the recording of Plaintiff was done while he was acting as a confidential witness in a bribery sting operation.

176.    Part of the assignment where he was working as the confidential informant was to attempt to have Paul Nelson repeat the earlier bribery offer.

177.    Rather than providing this context, Defendant Nesbitt purposely withheld this information from the Court so that the Court would issue the warrant.

178.    Upon information and belief, if the full context of the recording were provided to the Court, the search warrant would not have been issued and the criminal charges never filed.

179.    The FBI knew that the offer of payment for the dismissal of charges against Marc Jenson was done in connection with Plaintiff as a confidential informant.

180.    On information and belief, the FBI based in Utah provided State agencies with access to the files containing accurate information about Plaintiff's role in its investigation of Mr. Jenson's attempts to improperly influence his criminal case.

181.    Defendants Pickens, Isakson, Nesbitt and Gill and the other County Defendants had access to a complete history of Plaintiff's participation in the sting operation.

182.    On November 19, 2008, months after Mr. Jenson's plea agreement, the Department of Justice declined to prosecute Mr. Jenson and Mr. Nelson for attempted bribery and related crimes.

183.    Defendant Nesbitt, with the knowledge, assistance and support of Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill, and others in his office, failed to inform the Magistrate of the contents of an interview with Charlene Barlow, a prosecutor in the Marc Jenson matter, where Ms. Barlow indicated that she did not have personal knowledge of a quid pro quo agreement between Plaintiff and Mr. Jenson, and that she did not think that it was unethical that Plaintiff wanted a plea in abeyance instead of a trial.

184.    Mr. Jensen's plea in abeyance was entered while the bribery sting operation targeting Mr. Jenson and Mr. Nelson was still underway and well before federal authorities made their charging decision against Mr. Jenson and Mr. Nelson in connection with their scheme.

185.    According to federal authorities, the bribery scheme was not prosecutable because Mr. Nelson had "qualified" his offers with language that Mr. Jenson was innocent and the funds would be available to Plaintiff if he "did the right thing." The federal authorities did not specifically address Mr. Nelson's threats against Plaintiff.

186.    Defendants Isakson and Pickens possessed personal knowledge about the investigation into Mr. Jenson's and Mr. Nelson's conduct with the cooperating assistance of Plaintiff. Without Plaintiff's cooperation, no information would have been available.

187.    Prior to filing charges against Plaintiff, Defendants Nesbitt, Gill, and the other County Defendants knew Plaintiff was a victim and confidential informant in the federal investigation, but also contained correspondence and recordings that undermined the SLCPCTF's narrative of Mr. Nelson's scheme and plea negotiations.

188.    Defendants Nesbitt, Gill, and the other County Defendants omitted critical information from the search warrant affidavits and the probable cause statement in support of the criminal information, about Plaintiff's collaborative role in a federal investigation of Mr. Jenson and Mr. Nelson.

189.    Defendant Gill and others in his office knew of the false and omitted information and that they lacked probable cause to bring the charges in the initial criminal information against Plaintiff.

190.    Defendants Nesbitt, Pickens, Isakson, Gill, and other members of Gill's office lacked any direct evidence that Mr. Jenson or related persons or entities contributed to Plaintiff's campaign as a purported quid pro quo, let alone the dismissal of the criminal charges against Mr. Jenson

191.    Defendants Nesbitt, Pickens, Isakson, Gill, and other members of Gill's office nevertheless painted a false and inaccurate narrative of Plaintiff's role in the sting operation to the magistrate and the public.

192.    The only way for Defendants to secure a search warrant was to misrepresent the aforesaid information to Judge Trease.

193.    Information about the sting operation led by Defendant Pickens was not contained in the search warrant affidavit provided by Nesbitt. In fact, Nesbitt swore in the July 5, 2014 affidavit filed with the court that the affidavit was reviewed for accuracy by Special Agent Isakson, Special Agent Ulsh, and or Supervisory Special Agent Pickens.

194.    Defendants Nesbitt and Isakson and with the knowledge and assent of Pickens and Defendant Gill and other members of his office, interviewed Marc Jenson, who was serving a lengthy prison sentence.

195.    Marc Jenson had, in the nearly three years since his plea in abeyance revocation hearing, never once alleged unethical conduct by Plaintiff until his failed parole hearing.

196.    Defendants knew Marc Jenson harbored ill-will and was substantially biased against Plaintiff.

197.    Defendants knew that Marc Jenson made threats to "get revenge" on Plaintiff.

198.    Defendants Nesbitt, Isakson and Pickens were well aware of Mr. Jenson's threats because letters and recorded phone calls had been sent to Nesbitt at FBI headquarters in Salt Lake City from May 2012 through February 2013.

G.    **COUNT 2 OF THE CRIMINAL CHARGES, RECEIVING OR SOLICITING A BRIBE AND COUNT 3 OF THE CRIMINAL CHARGES. RECEIVING OR SOLICITING A BRIBE (May 4, 2009 through May 5, 2009 and June 5, 2009 through June 7, 2009)**

199.    Defendants represented to the Court in the search warrant affidavit that Marc Jenson paid Tim Lawson $120,000 in 18 separate payments to provide access to Plaintiff and John Swallow.

200    Defendants found no evidence that Plaintiff knew of or was the beneficiary of any payments made by Tim Lawson, because no such evidence ever existed.

201.    Defendants further represented that on or about April 30, 2009, Marc Jenson paid Lawson one of the 18 payments in the amount of $6,190.00 to arrange and pay for trips for Plaintiff and John Swallow to the Pelican Hill Resort ("Pelican Hill"), a high-end resort in California, where Jenson was staying at the time.

202.    In the very next sentence of the affidavit and in charging documents, Defendants allege that Jenson directly paid for lodging and expenses including massages, golf, food, and clothing items at the Pelican Hill Resort for Plaintiff and John Swallow.

203.    On May 4, and 5, 2009, Plaintiff, in company with others and at the invitation of Tim Lawson, took a trip to Pelican Hill to work on his novel.

204.    Plaintiff returned to Southern California on his own June 5 through June 7, 2009, staying at a home belonging to a friend's parents to continue working on his novel with the goal of finishing it before the end of the year. That friend had no connection to Marc Jenson.

205.    Defendants failed to mention that these trips took place more than a year after Mr. Jenson entered into his plea deal with the Court.

206.    Tim Lawson always maintained to prosecutors and investigators that he paid for the trip and that he told Plaintiff repeatedly that he paid for the three-day stay in May.

207.    Defendants Pickens, Isakson and Nesbitt alleged that Plaintiff knew that Marc Jenson had given Tim Lawson the funds to arrange and pay for the trips for the purpose of Plaintiff and Marc Jenson to meet.

208.    Defendants knew Plaintiff did not have any substantive communications with Mr. Jenson during his stay at Pelican Hills Resort, other than to urge him to pay the restitution he agreed to as part of his plea in abeyance.

209.    Defendants Nesbitt with the knowledge and assent of Defendants Pickens and Isakson, and in collaboration with Defendant Gill and others in his office, falsely alleged that during his abeyance period Jenson was under supervisory probation with the Office of Attorney General.

210.     Nesbitt with the knowledge and assent of Pickens and Isakson, and in collaboration with Gill and others in his office, knowingly painted false and inaccurate narratives about the trips to the Magistrate in the affidavits for search warrants, in their declaration of probable cause, and to the public.

211.    Nesbitt with the knowledge and assent of Pickens and Isakson, and in collaboration with Gill, and others in his office, knowingly and maliciously misrepresented that Plaintiff denied knowing, at the time, that Mr. Jenson may have surreptitiously contributed to the cost of the trip to Pelican Hills Resort.

212.     Nesbitt with the knowledge and assent of Pickens and Isakson, and in collaboration with Gill, and others in his office, willfully omitted from search warrant affidavits and the probable cause statement that Mr. Lawson never deviated from his immunized testimony that he paid for the trip and that he told Plaintiff repeatedly that he paid for the three-day stay in May of 2009.

213.     The search warrant affidavit was also "supported" by Jenson.

214.     Defendants used Jenson's testimony, which they knew was false, so that they could pursue the unfounded criminal charges and publicly disgrace Plaintiff and his family.

215.     Defendants knew that Plaintiff never received anything from Jenson.

216.     Defendants knew that Jenson never received anything from Plaintiff.

217.     Defendants knew that on November 3, 2011 Jenson was sentenced to up to ten years in prison on the charges brought by Plaintiff as Utah Attorney General.

**H.     COUNT 4 OF THE CRIMINAL CHARGES. RECEIVING OR SOLICITING A BRIBE AND COUNT 5, ACCEPTING A GIFT. THE SLCPCTF, INCLUDING PICKENS, ISAKSON AND NESBITT FABRICATED AN IMPROPER CONNECTION BETWEEN PLAINTIFF AND COMPAIGN CONTRIBUTORS**

**1.     MENTORING OF AMERICA, LLC**

218.     Mentoring of America, LLC ("MOA") was a Utah-based call-center company and a contributor to Plaintiff's campaign.

219.     Timothy Lawson worked for MOA.

220.     On or about November 1, 2008, MOA contributed $2,500 to Plaintiff's second re-election campaign for Attorney General.

221.    MOA was but one of hundreds of individuals or entities that contributed to Plaintiff's 2008 campaign.

222.    In affidavits in support of search warrants, Defendants Pickens, Isakson and Nesbitt, with the assistance, review and/or final approval of Defendant Gill and other Salt Lake County employees distorted the relationship between Plaintiff and MOA.

223.    MOA was the subject of three fraud investigations by the Utah Division of Consumer Protection that resulted in administrative citations and one enforcement action in 2006.

224.    The affidavits misrepresented to the court the timing and amount of donation, in addition to alleging that the donation amounted to some sort of bribe from MOA to Plaintiff's re-election campaign in November 2008.

225.    The affiants (Defendants Pickens, Isakson, and Nesbitt) failed to mention the fact that the investigation into MOA had concluded two years before the donation to Plaintiff's campaign.

226.    Defendants knew that there was nothing illegal about the donation.

227.    Defendants misrepresented the date and scope of the investigation for the purpose of misleading the Court

228.    After unlawfully securing the search warrant, Defendants held a press conference and took other measures to share their version of the investigation with the media.

229.    Defendants' actions were calculated to cause the maximum damage to Plaintiff and his family.

230.     Defendants Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Defendant Gill and other members of his office, without any evidence in support of such a connection, fraudulently suggested there was a link between MOA's lawful campaign contribution and Marc. Jenson's criminal case.

231.     Defendants Pickens, Isakson, Nesbitt, Gill, and other members of his office all knew there was no relationship between MOA and Mr. Jenson.

232.     Defendants Pickens, Isakson, and Nesbitt knew that the amount and timing of contributions demonstrated there was not the connection falsely suggested in the affidavits.

233.     Defendants Pickens, Isakson and Nesbitt willfully or negligently failed to interview MOA executives, whom are referenced by name in the affidavits (and none of whom are Tim Lawson or Marc Jenson), to verify whether there was a connection between the company and Mr. Jenson.

234.     Instead, Defendants Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Defendant Gill and other members of his office included in, and signed off on, the misleading statements in the affidavits about MOA for the express purpose of furthering a false narrative about Plaintiff's tenure as Attorney General.

235.     Similarly, Defendants Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Defendant Gill and other members of his office compounded this error by omitting or misconstruing the timeline of the allegations surrounding MOA.

### 2.     JONATHAN EBORN AND PAY-TO-PLAY

236.     Jonathan Eborn was the owner and operator of Infusion Media, an internet marketing company.

237.    Mr. Eborn attended a fundraiser for Plaintiff's re-election to Utah Attorney General in 2008, which cost $5,000.00 per person to attend.

238.    Jonathan Eborn made campaign contributions to Plaintiff's campaign for his 2008 Attorney General campaign.

239.    Defendants Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Defendant Gill and other members of his office alleged that Plaintiff had, through John Swallow, requested additional "donations" to his campaign in exchange for a promise that if Mr. Eborn's business was being investigated by the State of Utah, that Plaintiff would notify him so that Mr. Eborn could handle the matter before it escalated.

240.    In 2013, Defendants Nesbitt, and Isakson interviewed Mr. Eborn as part of their investigation.

241.    Mr. Eborn was given immunity for any information that he could provide regarding Plaintiff.

242.    The interview was recorded and all of the Defendants had possession or control of the audio recordings and official transcripts prior to the preparation of search and arrest warrant affidavits and prior to the initial criminal information against Plaintiff.

243.    Defendant Nesbitt falsely quoted Mr. Eborn to say in the audio recordings, that Plaintiff had promised that if Mr. Eborn donated $25,000 to his campaign fund, Plaintiff would notify him, as a courtesy, if he received a complaint from the Utah Division of Consumer Protection, so that he (Eborn) could "handle the matter."

244.    However, Mr. Eborn admitted in the recordings that he could not remember specific statements, given the length of time that had elapsed between his interview and events in

2008, and specifically denied leading questions from Defendant Nesbitt and Isakson that Plaintiff had made such a promise. Nowhere in the recording or the transcript of the interviews with Eborn did he make that statement falsely attributed to him in the warrant affidavits and probable cause statement in support of the charges.

245.    Defendant Nesbitt with the knowledge, assistance and support of Pickens and Isakson, and the encouragement, assistance, and the formal approval of Gill, and others in his office, fabricated the alleged statements in the sworn affidavits and attributed them to Mr. Eborn.

### 3.    JEREMY JOHNSON

246.    Jeremy Johnson was a business man who owned an interest in a Utah business called iWorks.

247.    The Utah Division of Consumer Protection launched an investigation of Jeremy Johnson and his business, iWorks in 2002 and 2003.

248.    The Utah Division of Consumer Protection resolved its investigation into Jeremy Johnson and iWorks with settlement agreements dated October 1, 2003, and June 8, 2005.

249.    In March, 2010, Jeremy Johnson became interested in an online poker project within the State of Utah.

250.    Plaintiff and John Swallow had meetings with Jeremy Johnson and others to discuss the legalities of the online poker project.

251.    Plaintiff informed Mr. Johnson that he could not deem online poker legal in the State of Utah.

252.    John Swallow continued meeting with Jeremy Johnson and continued to attempt to arrange other meetings with other high-ranking officials.

253.    During 2010, Jeremy Johnson and his company, iWorks was under investigation by the Federal Trade Commission.

254.    On December 21, 2010, the Federal Trade Commission filed its civil Complaint against Jeremy Johnson in Nevada for marketing products using negative option continuity programs and on June 15, 2011, Johnson was indicted in Utah for mail fraud in the U.S. District Court for the District of Utah.

255.    Years before federal investigators pursued regulatory and criminal actions against Mr. Johnson, Plaintiff and Mr. Johnson participated in supporting two private charitable organizations: (1) the Utah Meth Cops Project, created by Plaintiff to offer treatment to police officers exposed to hazardous chemicals during drug raids; and (2) The Lost Boys, an organization that offers refuge to young men expelled by polygamist sects and living homeless.

256.    In addition, Mr. Johnson provided tens of thousands of dollars to Plaintiff's Internet Crimes Against Children Task Force. Throughout the affidavits, Defendant Nesbitt with the knowledge, assistance and support of Pickens and Isakson, and the encouragement, assistance, and at least the formal approval of Gill and others in his office, deliberately misrepresented fundraising or assistance with fundraising for the charitable projects as if they were political campaign fundraising.

257.    Nesbitt with the knowledge, assistance, and support of Pickens and Isakson, and the encouragement, assistance, and the formal approval of Gill, and others in his office, deliberately misrepresented Plaintiffs' use of Johnson's home (the "Green House") and the aircraft belonging to Jeremy Johnson in February, 2011, as bribery, despite the fact Johnson was

not under investigation by the Division of Consumer Protection, the Office of Attorney General, or any other state regulatory agency.

258.     Gill, Nesbitt, Pickens and Isakson knew that Plaintiff never took any official act relating to Johnson, but omitted that fact from search warrant affidavits, the probable cause statement and the criminal information.

259.     The affidavits prepared sworn to and approved by Nesbitt, Pickens, and Isakson contain the clearly deliberate omission of a key piece of exculpatory information obtained in a SLCPCTF immunized interview with Mr. Johnson, in which Mr. Johnson stated: "[T]here was no quid pro quo with Mark Shurtleff."

260.     Despite the absence of any illegal, or even logical connection, said Defendants in the affidavits, probable cause statement and criminal charges continuously emphasize the relationship between Plaintiff and Mr. Johnson in a manner that is misleading and inaccurate.

261.     Nesbitt with the knowledge, assistance and support of Pickens and Isakson, and the encouragement, assistance, and the formal approval of Gill and others in his office, failed to provide any supporting evidence connecting Mr. Johnson to Plaintiff or of any improper conduct following his departure from office in any of their affidavits and declarations because none existed.

I.     **COUNT 6, ACCEPTING A GIFT**. **THIS ALLEGATION APPEARS TO BE A "CATCH ALL" AND HAS NO APPARENT EVIDENCE AND DOES NOT RELY ON ANY DIRECT ALLEGATIONS.**

262.     This allegation is for a time period of January 1, 2009 through May 1, 2010.

263.     Nesbitt's declaration in support of the Information does not allege events that took place during this time period, there are no specific allegations to support this Count in the Information.

264.     Defendant Gill's actions in adding a "catch all" to the Information was malicious and without any basis in fact or evidence.

**J.      COUNT 7, ACCEPTING EMPLOYMENT THAT WOULD IMPAIR JUDGMENT. DEFENDANTS DELIBERATELY MISCHARACTERIZED AN EMPLOYMENT OPPORTUNITY PLAINTIFF ACCEPTED AFTER HIS TENURE AS ATTORNEY GENERAL**

265.     Throughout the affidavits Defendant Nesbitt, with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, intentionally used material misrepresentations and omissions to mislead the magistrate about the State of Utah's participation in *Bell v. Countrywide Bank NA*, a private civil suit pending in the United States District Court for the District of Utah from March 2011 to February 2013.

266.     This private action, which involved, among others, Countrywide Bank, N.A. d/b/a/ Bank of America ("BOA"), was originally filed in State court. It was removed to federal court on March 22, 2011.

267.     Defendant Nesbitt with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, either intentionally or recklessly attempted to create a negative inference from the fact that Plaintiff met with Countrywide representatives and then, two weeks later, an extension was granted to Countrywide.

44

268. This case involved the foreclosure of a property owned by Timothy and Jennifer Bell.

269. With Plaintiff's authorization, the Attorney General's office for the State of Utah intervened in that action seeking to prohibit Recon Trust, a Texas corporation without a place of business in the State, from conducting non-judicial foreclosures in Utah.

270. During this time period, the Bells held a fundraiser for Deputy Attorney General John Swallow in their home (the home that was the subject of the foreclosure litigation.)

271. Plaintiff was unaware of the fundraiser until sometime later.

272. During 2012, Plaintiff had already determined that he would not run for Attorney General again.

273. During 2012, Plaintiff had interviewed with several prominent national law firms and had received job offers from three of them. Ultimately, Plaintiff accepted the offer from Troutman Sanders, an international law firm with headquarters in Atlanta, to work in the firm's Attorney General practice based in Washington DC. Troutman Sanders, like many large firms, happened to have Bank of America as one of hundreds of clients in the United States and internationally.

274. As a result of open settlement negotiations, including an agreement by BOA to stop using its local Utah affiliate to process foreclosures (which was the fundamental basis for the State of Utah intervening in the first place), the Attorney General's office withdrew from the *Bell* litigation after Bell had separately negotiated his own settlement agreement.

275. Count 7 of the Information alleges that Plaintiff somehow benefitted by receiving a job offer from Troutman Sanders after a series of events that involved John Swallow and the

Bells and in the settlement and dismissal of a private Bank of America case in which the State had intervened.

276.    Misconstruing the import and scope of settlement negotiations in the *Bell* case, Agent Nesbitt with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, intentionally or recklessly attempted to create a false inference that the Attorney General's Office abandoned the legal interests of thousands of Utah citizens.

277.    However, the Attorney General's Office remained active in asserting the same arguments and interests in other cases pending before the federal district and circuit courts. Defendants Nesbitt, Pickens, Isakson, Gill, and the other County Defendants (John and Jane Does) had knowledge of these facts and intentionally and maliciously omitted them from the affidavits, probable cause statement and criminal charges.

278.    Defendant Nesbitt with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, intentionally and deliberately omitted from the affidavits, probable cause statement, and criminal information that the Attorney General's Office had completed the investigation into Bank of America two years before Mr. Bell filed his private civil action.

279.    Under Plaintiff's leadership, the Attorney General's office negotiated a nationwide settlement with the five largest banks, including Bank of America, which brought tens of millions of dollars to Utah homeowners and the State for the benefit of those who fell victim to anti-consumer practices. Those facts were also deliberately omitted from the affidavits.

280.    Defendant Nesbitt with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, failed to provide information to the magistrate related to the five cases in which the State continued to pursue the interests of homeowners.

281.    Defendant Nesbitt and the other Defendants purposely misrepresented and selected the Bank of America because they were aware of the Bank of America case and knew that they could cast aspersions on Plaintiff's reputation by mischaracterizing the information.

282.    Defendant Gill, authorized, directed and/or acquiesced to Nesbitt's application contained the false and misleading information.

283.    Defendants Nesbitt, Pickens, Isakson, and Gill had no information or evidence that Plaintiff's offer of employment on the "State Attorneys General Team" of a nationwide firm that represents hundreds of corporate clients bore any relation to the State's minor participation in the *Bell* litigation.

284.    Defendants did not interview attorneys at Troutman Sanders who would have fully debunked the false claim that the settlement of the *Bell* litigation had any relation whatsoever to Plaintiff's offer of employment.

285.    On January 3, 2013, a Salt Lake Tribune Article by Tom Harvey was published regarding Plaintiff and the dismissal of the *Bell* litigation.

286.    In drafting the affidavits for warrants, Defendant Nesbitt, with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, selectively used quotes from

the newspaper article. Defendants deliberately withheld Plaintiff's quotes in that same newspaper story which were exculpatory and provided reasonable and lawful motives for his actions.

287.   Defendant Gill and the other County Defendants knew that Plaintiff's employment at Troutman Sanders was not related to the *Bell* litigation and yet maliciously and without probable cause brought a criminal charge against Plaintiff based upon supposition, innuendo, and an unsupported newspaper article.

288.   Prosecutor Defendant Gill, and others in his office should have never approved any search warrant affidavit or probable cause statement containing unverified and unconfirmed media stories and should not have brought a criminal charge against Plaintiff based upon such dubious information.

### K.   COUNT 8, TAMPERING WITH A WITNESS. AGENT NESBITT AND THE SLCPCTF MISLED THE COURT ABOUT A MEETING BETWEEN PLAINTIFF AND DARL McBRIDE

289.   On May 8, 2009, Darl McBride, a Utah-based entrepreneur, met with Plaintiff at Mimi's Café, a restaurant located in Sandy, Utah. Mr. McBride controlled the subject matter of the conversation, which he surreptitiously recorded without Plaintiff's knowledge or consent.

290.   Plaintiff rarely spoke during the course of the meeting. Plaintiff merely asked questions to clarify Mr. McBride's narrative of events. In a few instances, Plaintiff explained the background of Mr. Jenson's prosecution and his relationship to Tim Lawson.

291.   Mr. McBride spent the majority of the meeting explaining how he had lost substantial funds investing in a fraudulent scheme perpetrated by Mark Robbins, an entrepreneur who had connections to Marc Jenson.

292.     Mr. McBride accused Mr. Robbins of perpetrating a Ponzi scheme. He claimed that he had taken out loans to pay Mr. Robbins and that Mr. Robbins promised to pay back Mr. McBride but failed to do so. Mr. McBride further claimed that Mr. Robbins had perpetrated similar fraudulent schemes on other investors.

293.     In 2008, Mr. Robbins claimed that he was a victim of the fraudulent scheme at the heart of Mr. Jenson's criminal case. Prior to Mr. Jenson's plea in abeyance, prosecutors intended to use Mr. Robbins as a key witness in Mr. Jenson's trial.

294.     Mr. McBride claimed he had been threatened by Mr. Lawson if he moved forward with a plan to sue Mr. Jensen for lost investment funds.

295.     Plaintiff informed Mr. McBride that Mr. Jenson and Mr. Robbins had been partners, and that Mr. Jenson was currently subject to a three-year plea in abeyance.

296.     Plaintiff indicated that Mr. Robbins was one of the witnesses in the criminal case against Mr. Jensen. Plaintiff informed Mr. McBride that issues relating to the credibility of Mr. Robbins undermined the strength of the criminal case against Mr. Jenson.

297.     Plaintiff agreed to look into Mr. McBride's concerns as he would those of any other Utah citizen seeking help from the elected Attorney General.

298.     Plaintiff did not discourage Mr. McBride in his pursuit of Mr. Robbins. Plaintiff encouraged Mr. McBride to pursue a variety of different forms of legal relief, including additional lawsuits against Mr. Robbins.

299.     Plaintiff had no financial or personal interest in resolving the dispute between the two businessmen in favor of Mr. Robbins.

300.    Plaintiff had no ability to cause Mr. Jenson to pay Mr. McBride, because the court ordered payment of restitution including specified victims, none of whom were Mr. McBride or Mr. Robbins.

301.    Defendants falsely suggested in the search warrant affidavit that the recording of the meeting contained a discussion in which Darl McBride told Plaintiff that he needed $2,000,000 and in which Plaintiff assured him that Marc Jenson was "good for it."

302.    Defendants Nesbitt, Pickens, Isakson and Gill knowingly and falsely alleged that Plaintiff attempted to persuade McBride to "back off".

303.    Defendants represented in the search warrant affidavit that Marc Jenson told Nesbitt that "he, Plaintiff and John Swallow met in California and that Plaintiff told him that he needed to give $2,000,000 to Tim Lawson for Tim Lawson to give to Darl McBride because that was how much it would take to get Darl McBride to back off of Mark Robbins."

304.    Plaintiff had no logical reason to intervene in any settlement negotiations between Darl McBride, Mark Robbins, or Marc Jenson.

305.    Plaintiff had no financial or personal interest in resolving the dispute between the two businessmen in favor of Mr. Robbins.

306.    Mr. McBride later brought a civil case in the Third Judicial District Court, State of Utah, against Mr. Robbins for acts that allegedly occurred in 2012.

307.    Defendant Nesbitt, with the knowledge, assistance, and support of Pickens and Isakson, and the encouragement, assistance, and the formal approval of Gill and others in his office, falsely accused Plaintiff of soliciting a bride from Marc Jenson so that he could pay McBride to back off.

308.    Plaintiff did not attempt to discourage Mr. McBride's pursuit of Mr. Robbins. To the contrary, Plaintiff encouraged Mr. McBride to pursue a variety of different forms of legal relief, including additional lawsuits against Mr. Robbins.

309.    This allegation by Defendants in the Information of soliciting a bribe from Mr. McBride was an empty allegation and not supported by any evidence or fact. It was designed to cast doubt and suspicion on Plaintiff's otherwise stellar career.

310.    Defendants SLCPCTF and Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Gill and others, misrepresented the conversation that occurred at the Mimi's Café meeting in the hopes of obtaining search and arrest warrants and in bringing criminal charges against Plaintiff.

### L.    COUNT 9 OF THE CRIMINAL CHARGES, TAMPERING WITH EVIDENCE. DEFENDANTS UNREASONABLY FILED CHARGES FOR THE DISPOSAL OF A PERSONAL LETTER

311.    Sometime in early 2012, Plaintiff received a letter from Marc Jenson at his home address in Sandy, Utah, while Mr. Jenson was in prison.

312.    The letter contained threats against Plaintiff and demanded that Plaintiff visit Mr. Jenson in prison.

313.    Plaintiff notified prosecutors assigned to Marc Jenson's case about the letter.

314.    Defendants SLCPCTF and Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Gill and others, misrepresented the timing and importance of the letter and omitted the known fact that Plaintiff first notified his prosecutors about the letter. Defendants deliberately misconstrued its meaning, and deliberately misinformed the Magistrate

Judge in affidavits, probable cause statement and criminal charges of its contents and importance.

**M.**     **COUNT 10 OF THE CRIMINAL CHARGES, OBSTRUCTING JUSTICE. DEFENDANTS MISCONSTRUED AND MISCHARACTERIZED IN SEARCH AND ARREST WARRANT AFFIDAVITS PLAINTIFF'S VOLUNTARY INTERVIEWS WITH THE FBI.**

315.     On May 6, 2013, Plaintiff visited the FBI's office for the purpose of answering questions arising out of the investigation of John Swallow. Plaintiff made it known that his participation was voluntary, just as were his four prior interviews since 2007.

316.     Plaintiff was informed by Isakson that he was not the target of the investigation. Attendees included Plaintiff, Special Agent Jon Isakson, Special Agent Crystal Bowen, and Assistant United States Attorney Ed Sullivan from the Department of Justice PIN (Public Integrity Section).

317.     Defendants SLCPCTF and Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Gill and others, knowingly misrepresented the content and scope of the interview in their search warrant affidavits and information to allege criminal activity when none existed.

**N.**     **DEFENDANTS KNEW THAT THE INFORMATION IN THE AFFIDAVITS WAS BASED ON INADEQUATE AND MISSING INFORMATION.**

318.     Defendant Salt Lake District Attorney's Office, under the direction and guidance of Defendant Gill and with the assistance of others in Gill's office, Defendants FBI and SLCPCTF, and Defendants Utah DPS and SBI provided direction, instruction, oversight, encouragement, and assistance to Nesbitt, Perkins, Isakson, and other Doe Defendants throughout the course of the investigation.

319.    On information and belief, FBI-Utah provided state agencies with access to the files containing accurate information about Plaintiff's role in its investigation of Mr. Jenson's attempts to improperly influence his criminal case in 2008 including the sting operation described above.

320.    Most of the interviews of potential witnesses were conducted jointly by Defendants Nesbitt and Isakson. Both FBI-Utah agents possessed accurate information about the circumstances surrounding the recorded conversations. Pickens and Isakson assisted Nesbitt in drafting the warrants including the allegations related to recorded conversations.

321.    The search warrant affidavit is peppered with a series of innocuous events surrounding Plaintiff's use of an aircraft and vehicle owned by Mark Jenson and his visit to Pelican Hills Resort at Tm Lawson's invitation. The Defendants never made the effort to investigate the circumstances surrounding those events.

322.    Defendants took the image of those events and combined them with the testimony of someone that had failed to bribe Plaintiff—Mark Jenson.

323.    None of the transactions/events described in the search warrant affidavit provide any basis for probable cause for the search warrant.

324.    Defendant Salt Lake District Attorney's Office, under the leadership, direction and guidance of Defendant Gill and with the assistance of Defendants FBI and SLCPCTF, and Defendants Utah DPS and SBI all had access to SLCPCTF files containing all of the evidence and provided oversight and assistance when Agent Nesbitt submitted intentionally and recklessly false statements in search and arrest warrant affidavits in an attempt to manufacture probable cause where none actually existed.

325.    Defendants Salt Lake District Attorney's Office, Gill, FBI, SLCPCTF, Utah DPS and SBI intentionally false, inaccurate, and incomplete statements in the affidavits to secure a series of search warrants, the arrest warrant and the criminal Information filed against Plaintiff.

**O.    DEFENDANTS REPEATED THE FALSE AND MISLEADING STATEMENTS IN THEIR AFFIDAVITS IN SUPPORT OF SEARCH WARRANTS AND ARREST WARRANTS AND CRIMINAL INFORMATIONS.**

326.    Defendants always knew that there was no basis for criminal charges against Plaintiff.

327.    Defendant Nesbitt, with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office stated express falsehoods and used intentional and/or reckless misrepresentations and material omissions in Search Warrant Affidavit 158.

328.    When Jenson came along with his outlandish complaints and allegations against Plaintiff, the Defendants seized on it to provide a "basis" for the criminal charge.

329.    The search warrant affidavit is repleat with references to Jenson which formed the basis for the criminal charges.

330.    Defendants knew that Jenson was inherently unreliable and not trustworthy.

331.    Defendants knew that Jenson would not be believed in Court and that his testimony didn't even amount to a basis for probable cause.

332.    Plaintiffs' civil and constitutional rights were violated by Defendants in the course of publicly disgracing him.

P.   **AGENT NESBITT RELIES HEAVILY ON ASSERTIONS BY MEMBERS OF THE SLCPCTF THROUGHOUT THE SEARCH WARRANT AFFIDAVITS**

333.   The information for the basis of the search warrant was provided by members and contributors to SLCPCTF from their investigative work.

334.   Defendant Nesbitt's dependence on the federal investigatory work is illustrated by the fact that Isakson is referenced approximately 67 times throughout Search Warrant Affidavit 158, and Special Agent Ulsh is referred to approximately 9 times. Agent Nesbitt also references interviews initially conducted by FBI-Utah or DOJ-PIN, including interviews involving Plaintiff.

335.   Defendant Nesbitt with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, devotes substantial time and attention in the affidavits to several key witnesses in this case, including Marc Jenson and Jeremy Johnson, both of whom had been prosecuted the Attorney General's office for crimes of dishonesty, and who had been immunity for their testimony.

336.   Plaintiff's requests for production of known exculpatory evidence during the course of the criminal proceedings were repeatedly denied by Defendants in violation of Plaintiff's constitutional rights.

337.   Plaintiff was statutorily and constitutionally entitled to the production of all exculpatory and impeachment evidence, including information pertaining to the propriety of FBI-Utah's and SLCPCTF's involvement in the investigation and documents within the scope of Plaintiff's timely filed discovery requests.

Q.   **DEFENDANT GILL CANNOT RELY ON PROSECUTORIAL IMMUNITY**

338.    In addition to the actions of Defendant Gill as stated above, in early 2013, Marc Jenson ordered his representative, Paul Nelson, to meet with Defendant Gill for an interview. Defendant Gill stepped outside his role as a prosecutor to lead and conduct witness interviews, including a one-hour long interview with Nelson.

339.    Almost without exception, the entire interview was conducted by Defendant Gill acting as an investigator, seeking evidence and trying to build a criminal case.

340.    Nelson told Defendant Gill that Marc Jenson told him during a jail visit to tell Defendant Gill about  "corruption" by Plaintiff.

341.    Nelson related a story about the 2007 bribery that Gill and Nesbitt knew was false because by this time they were fully aware of the FBI led sting operation using Plaintiff as their Confidential Informant.

342.    Defendant Gill asked for notes and documentation from Nelson.

343.    Defendant Gill repeated the false narrative he and his office had created by systematically releasing the affidavits to the public, and in knowingly trying Plaintiff's case in the public forum, knowing that Plaintiff could not respond publicly.

344.    At the conclusion of the initial DOJ and FBI investigation, the DOJ declined to prosecute Plaintiff, having decided that there was no probable cause.

345.    When asked about the fact that the Department of Justice declined to prosecute after their investigation, Defendant Gill boasted to the cameras that he was very disappointed with how the DOJ handled the investigation and that due to their involvement, part of the investigation was compromised by what the DOJ did nor did not do."

346.     Again, sounding his campaign theme, Defendant Gill declared that public officials must be "above reproach" and must be held accountable.

347.     After the press conference, Defendant Gill went on the popular local radio program, *The Doug Wright Show*, and announced that he had charged Plaintiff and Swallow as co-defendants, even though the facts and the law made charging them as co-defendants unlawful. Defendant Gill did so for no reasons other than to further sensationalize the arrests, and further the story of political scandal for his own improper personal and political motives.

348.     On the radio show, Defendant Gill admitted that he had been very involved in the investigative process - more than on other cases.

349.     To continue his sensational public narrative of the "biggest political scandal in Utah history," Defendant Gill refused to separate the two prosecutions even when presented with facts and law that made the joint information unlawful.

350.     Only after winning a narrow election victory in November of 2014 did Defendant Gill suddenly decide to give up his prosecution and allow Troy Rawlings to take over the prosecution of Plaintiff.

351.     The first thing that Davis County Attorney Troy Rawlings did after taking over Plaintiff's case was to dismiss the sensational second-degree felony racketeering charge, on the grounds that probable cause had never existed. In fact, during the decision-making process he had argued with Defendant Gill that there was no probable cause to charge the racketeering count, but Gill insisted on charging it for his own malicious, personal, and political motives.

352.     When Troy Rawlings examined all the facts and learned that Defendants Nesbitt, Pickens, Isakson, and the other Doe Defendants had lied and had filed false, misleading, and

perjured search and arrest warrant affidavits, he determined that probable cause did not exist, and had never existed, and thereupon dismissed all of the criminal charges against Plaintiff.

353. Troy Rawlings will testify that he may never have brought charges against Plaintiff had he known the falsity of the allegations being brought.

354. During his prosecution of Plaintiff's criminal case, Troy Rawlings demanded that the federal government produce to him, and to Plaintiff, exculpatory evidence which he knew existed. He will testify that he was confronted and directly threatened by Gill, Pickens, Isakson, and Nesbitt and others of Gill's office.

355. After the criminal charges against Plaintiff were dismissed by the trial judge, Mr. Rawlings filed several motions for clarification asking the judge to dismiss with prejudice and to rule that the dismissal was on the same grounds as those in unopposed motions to dismiss filed by Plaintiff's defense team.

356. In those 2016 filings, Defendants Pickens, Isakson, and Nesbitt again demonstrated their malicious and unlawful motives and filed affidavits, under oath and subject to perjury, claiming that all of the allegations that they put into the search and arrest warrants were true, when in fact, they knew they were not.

357. Defendant Gill, and other Doe Defendants took their charges against John Swallow to trial in early 2016. They were assisted daily by Defendants Nesbitt, Pickens, and Isakson.

358. Defendant Isakson testified and committed perjury on the stand.

359. Much of the trial, including more than a full day of testimony by Marc Jenson, was focused directly on Plaintiff but not on John Swallow – whose trial it was.

360.    Defendants suborned perjury from Jenson and other witnesses, including Eborn,

361.    After fourteen hours of deliberation, on March 2, 2017, the jury returned a verdict of not guilty on all counts.

362.    Davis County Attorney Troy Rawlings blasted Defendant Gill in a statement issued on April 3, 2017, calling the verdict "predictable to any prosecutor who bothered to assess the evidence with an objective view and who was not controlled by the United States Department of Justice. . In addition to having his rights violated, Mark Shurtleff would have absolutely been acquitted as well."

## FIRST CAUSE OF ACTION

### On Behalf of Plaintiff Pursuant to the Supreme Court
### Ruling in *Bivens v. Six Unknown Agents*

363.    Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

364.    As a result of the aforementioned conduct of federal Defendants FBI, SLCPCTF, Special Agent Pickens, Isakson and FBI John Does' (and Defendant Nesbitt to the extent he was acting as a Special Deputy U.S. Marshall), Plaintiffs Mark and M'Liss' real and personal property were subjected to unlawful and unreasonable search and seizure.

365.    Plaintiff Thomas and Adrianna were subjected to excessive force due to the unlawful and unreasonable search and seizure of their persons and unlawful imprisonment.

366.    Plaintiff was subjected to unlawful and unreasonable search and seizure of his person, imprisonment, and malicious prosecution.

367.    These actions constitute a violation of said Plaintiffs' Constitutional rights under the Fourth Amendment.

368.    As a direct and proximate result of the Defendants' actions and conduct, Plaintiffs were deprived of their rights, privileges, and immunities under the Fourth Amendment of the United States Constitution, specifically the rights (1) to be secure in their persons, papers, and effects against unreasonable search and seizure; (2) not to be deprived of life, liberty, and property without due process of law; and (3) the right to not have excessive, wanton, or gratuitous force used without provocation in executing a search warrant and in effectuating an arrest.

369.    The United States Supreme Court in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), ruled that an implied cause of action existed for a Plaintiff, like Plaintiffs herein, whose Fourth Amendment freedom from unreasonable search and seizures had been violated by federal agents and that the victim of such a deprivation could sue for the violation of the Amendment itself, despite the lack of any federal statute authorizing such a suit. The *Bivens* case has been subsequently interpreted to create a cause of action against the federal government similar to the one 42 U.S.C. § 1983 creates against the states.

370.    All of Plaintiffs' claims against Defendants FBI, SLCPCTF, Special Agent Pickens, Isakson, FBI John Does (and Defendant Nesbitt to the extent he was acting as a Special Deputy U.S. Marshall), stem from unlawful violations of Plaintiffs' Fourth Amendment rights, notably, (1) the unlawful search and seizures of their persons and real and personal property; (2) Plaintiff's false arrest and imprisonment; (3) excessive force used against Thomas and Adrianna during the execution of the search warrant on their home; and (4) the arrest, retaliation, conspiracy, and malicious prosecution of Plaintiff.

371.    By reason of the intentional, malicious, and reckless acts of Defendants FBI, SLCPCTF, Special Agent Pickens, Isakson, FBI Jon Does (and Defendant Nesbitt to the extent he was acting as a Special Deputy U.S. Marshall), Plaintiffs suffered psychological, emotional, and physical pain and suffering, incurred medical and legal expenses, lost earnings, lost personal property, and suffered irreparable damage to reputations, and in other respects, were damaged.

372.    The aforesaid actions were done intentionally or committed with reckless or callous disregard for the Plaintiffs' rights.

373.    Plaintiffs are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION

### Violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the Constitution of the United States

374.    Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

375.    42 U.S.C. §1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivations of any rights, privileges, or immunities secured by the constitution shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

376.    Defendant Gill and members of his office, Defendant Nesbitt, and State Officers John Does to this Complaint, at all times relevant hereto, were acting under the color of State law in their capacity as agents, officers, or employees of the State of Utah Department of Public Safety, State Bureau of Investigations, SLCPCTF, or the Office of the Salt Lake County District

Attorney, and their acts or omissions were conducted within the scope of their official duties or employment.

377.    Plaintiffs in this action are citizens of the United States and all of the federal, state and local law enforcement and criminal justice Defendants to this Complaint are persons who, under the color of law, and without probable cause, subjected Plaintiffs, citizens of the United States, to the deprivations of their rights, privileges or immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution and are therefore liable to the Plaintiffs, who were injured, under 42 U.S.C. § 1983.

378.    Any reasonable law enforcement officer or criminal justice professional, including the State and local law enforcement and prosecutorial Defendants, knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

379.    To the extent any of these constitutional deprivations require a showing of specific intent and/or motive, the individual state and local law enforcement and prosecutorial Defendants acted intentionally, maliciously, and/or with reckless disregard for the natural and probable consequences of their actions.

380.    The state and local law enforcement Defendants' unlawful misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

381.    As a result of this violation, Plaintiffs suffered physical and emotional injuries, including but not limited to those associated with deprivation of liberty, severe emotional distress and suffering, severe and permanent mental distress and turmoil, anxiety, depression, insomnia,

embarrassment, and humiliation, and loss of income entitling them to compensatory and special damages to be determined at trial. Plaintiffs are further entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

382.    The aforesaid actions were done intentionally or committed with reckless or callous disregard for the Plaintiffs' rights.

383.    Plaintiffs are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION

**Violation of 42 U.S.C. § 1983-Excessive Force in violation of
the Fourth and Fourteenth Amendments**

384.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

385.    At the time of the complained of events, Plaintiffs Thomas and Adrianna had a clearly established constitutional right under the Fourth Amendment to be secure in their persons from unreasonable seizure through excessive force.

386.    Plaintiffs Thomas and Adrianna also had the clearly established Constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement.

387.    Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

388.    The federal, state and local law enforcement Defendants' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them and violated these Fourth Amendment rights of these Plaintiffs.

389.    The federal, state and local law enforcement Defendants unlawfully seized the persons of Plaintiffs Thomas and Adrianna by means of objectively unreasonable, excessive, and conscious shocking physical, verbal and emotional force, thereby unreasonably restraining Plaintiffs of their freedom.

390.    The force used constituted deadly force in that it could have caused death and did cause serious mental and emotional injury.

391.    The federal, state and local law enforcement Defendants' actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs Thomas' and Adrianna's federally protected rights. The force used by these state and local law enforcement Defendants shocks the conscience and violated their Fourteenth Amendment rights.

392.    None of the federal, state, and local law enforcement Defendants took reasonable steps to protect Plaintiffs from the objectively unreasonable and conscience shocking excessive force of other Defendant officers or from the excessive force of later responding officers despite being in a position to do so. They are each therefore liable for the injuries and damages resulting from the objectively unreasonable and conscience shocking force of each other officer.

393.    The federal, state, and local law enforcement Defendants acted willfully, maliciously, in bad faith, in reckless disregard of Plaintiffs' federally protected constitutional rights, and in concert and joint action with each other.

394.    The acts or omissions of the federal, state, and local law enforcement Defendants as described herein intentionally deprived Plaintiffs of their constitutional rights and caused them other damages.

395.    These individual federal, state, and local law enforcement Defendants are not entitled to qualified immunity for the complained of conduct.

396.    The individual federal, state, and local law enforcement Defendants to this claim, at all times relevant hereto, were acting pursuant to state and municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiffs.

397.    The acts or omissions of all individual state, federal, and local law enforcement Defendants' were moving forces behind Plaintiffs' injuries.

398.    As a direct and proximate result of individual federal, state, and local law enforcement Defendants' unlawful conduct, Plaintiffs have suffered actual physical and emotional injuries, and other damages and losses as described herein entitling them to compensatory and special damages, in amounts to be determined at trial.

399.    As a further result of the individual federal, state and local law enforcement Defendants' unlawful conduct, Plaintiffs have incurred special damages, including medically related expenses and will continue to incur further medical and other special damages in amounts to be established at trial.

400.    On information and belief, Plaintiff will continue to suffer lost future earnings and impaired earnings capacities in amounts to be ascertained in trial.

401.    Plaintiffs are further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1983, prejudgment interest and costs as allowed by federal law. There may also be special damages for lien interests.

402.     In addition to compensatory, economic, consequential and special damage,
Plaintiffs are entitled to punitive damages against each of the individually named federal, state
and local law enforcement Defendants under 4 U.S.C. § 1983, in that the actions of each of these
individual federal, state and local law enforcement Defendants have been taken maliciously,
willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiffs.

403.     The aforesaid actions were done intentionally or committed with reckless or
callous disregard for the Plaintiffs' rights.

404.     Plaintiffs are entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983-Malicious Prosecution in violation of the
### Fourth and Fourteenth Amendments

405.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set
forth herein.

406.     At the time of the complained of events, Plaintiff had the clearly established
constitutional right to be free from malicious prosecution without probable cause under the
Fourth Amendment and in violation of due process under the Fourteenth Amendment.

407.     Any reasonable police officer, attorney and prosecutorial professional, including
the Defendants in this case, knew or should have known of these rights at the time of the
complained of conduct as they were clearly established at that time.

408.     The individual federal, state and local law enforcement and criminal justice
Defendants, most notably Sim Gill, violated Plaintiff's Fourth and Fourteenth Amendment rights
to be free from malicious prosecution without probable cause and without due process when they

worked in concert to secure an arrest warrant based on false, fraudulent and perjured search and arrest warrant affidavits, newspaper and other media stories, personal political aspirations of Sim Gill, furtherance of the retaliatory intent of political opponents and individuals prosecuted and convicted by Plaintiff while Utah Attorney General, to secure false charges against him, resulting in his unlawful arrest, confinement and prosecution without probable cause.

409.    The Defendants, led by Sim Gill, conspired and/or acted in concert to institute, prosecute and continue criminal proceedings against Plaintiff without probable cause.

410.    At the time of the complained of events, Plaintiff had the clearly established constitutional right to be free from malicious prosecution without probable cause under the Fourth Amendment and in violation of due process under the Fourteenth Amendment.

411.    Individual federal, state and local law enforcement Defendants violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from malicious prosecution without probable cause and without due process when they worked in concert to secure false charges against him, resulting in his unlawful confinement and prosecution.

412.    Individual federal, state and local law enforcement Defendants conspired and/or acted in concert to institute, procure and continue a criminal proceeding for falsely alleged felonious crimes involving "public corruption" against Plaintiff without probable cause.

413.    The procurement and execution of the prosecution against Plaintiff for the knowingly false allegations were malicious, shocking, and objectively unreasonable in light of the circumstances.

414.    The criminal proceedings against Plaintiff was terminated in his favor by another prosecutor, Special Assistant Utah Attorney General Troy Rawlings upon close examination of

the allegations in light of the evidence and the unlawful, fraudulent conduct of Defendant law enforcement officers under the guidance, leadership and direction of Defendant Sim Gill and the named Salt Lake County Deputy DAs, and County John Does.

415.    These individual federal, state and local law enforcement and criminal justice and prosecutorial Defendants acted in concert and joint action with each other.

416.    The acts or omissions of the federal, state and local law enforcement and Criminal Justice and prosecutorial Defendants as described herein intentionally deprived Plaintiff of his constitutional and statutory rights and caused him other damages.

417.    For the reasons articulated above, the federal, state and local law enforcement and criminal justice and prosecutorial Defendants are not entitled to absolute or qualified immunity for the complained of conduct.

418.    The Defendants at all times relevant hereto were acting pursuant to state/municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in its actions pertaining to Plaintiff.

419.    As a proximate result of the federal, state and local law enforcement, criminal justice and prosecutorial Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

420.    The aforesaid actions were done intentionally or committed with reckless or callous disregard for the Plaintiffs' rights.

421.    Plaintiffs are entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTON

**Violation of 42 U.S.C. §1983 - Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth and Fourteenth Amendments and in violation of 42 U.S.C.§1981 *Monell* Claim Against the Utah State and Salt Lake County Defendants**

422.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

423.    Plaintiffs had the following clearly established rights at the time of the complained conduct:

  a.    the right to be free from unlawful search, seizure and arrest not based on probable cause;

  b.    the right to be secure in their person from unreasonable search, seizure and excessive force, under the Fourth Amendment;

  c.    the right to bodily integrity and to be free from excessive force by law enforcement under the Fourteenth Amendment; and

  d.    the right to be free from malicious prosecution under the Fourth and Fourteenth Amendments

424.    Federal, State and Salt Lake County Defendants had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia*:

  a.    a policy, practice and custom of use of excessive force against suspects;

b.      a policy, practice and custom of failing to properly train or supervise officers in the proper techniques of apprehending and arresting suspects;

c.      a policy, practice and custom of using false or fabricated evidence in arrest and search warrant affidavits;

d.      a policy, practice and custom of not following proper identification proceedings and using tainted identifications in effectuating the arrest and prosecution of innocent suspects;

e.      a policy, practice and custom of failing to properly discipline officers who violate the United States Constitution or law, or otherwise transgress the rights of criminal suspects during their investigation; and

f.      a policy, practice and custom of immediate public vilification of persons accused of "high-profile" crimes with concomitant refusal to consider evidence inconsistent with that portrayal.

425.    These interrelated policies, practices and customs, separately and/or together, were implemented with deliberate indifference, and were a direct and proximate cause of Plaintiffs 'Constitutional violations and injuries, as set forth above.

426.    These interrelated policies, practices and customs, separately and/or together, were the direct and proximate cause of the injury and damage to Plaintiffs and violated their rights guaranteed by the United States Constitution.

427.    The existence of these interrelated policies, practices and customs can be inferred from numerous incidents reflecting a pattern of police and prosecutorial misconduct like that alleged herein.

428.    The existence of these interrelated policies, practices and customs can be inferred from the fact that the incidents of police and prosecutor misconduct alleged herein were authorized by individuals with policymaking authority in the Federal, State and Salt Lake County law enforcement and criminal justice agencies.

429.    Defendants are not entitled to absolute or qualified immunity for the complained of conduct.

430.    Federal, State and Salt Lake County Defendants were, at all times relevant, policymakers and in that capacity established policies, procedures, customs, and/or practices for these law enforcement and criminal justice agencies.

431.    Federal, State and Salt Lake County Defendants have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiffs and of the public.

432.    In light of the duties and responsibilities of law enforcement officers and prosecutors that participate in preparation and approval of search warrants, arrests and preparation of police reports and criminal informations on alleged crimes, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights such as those described herein that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

433.   The deliberate indifference to training and supervision by Federal, State and Salt Lake County Defendants resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to said Defendants and was the moving forces in the constitutional and federal violations complained of by Plaintiffs.

434.   As a direct result of Defendants' unlawful conduct, Plaintiffs have suffered actual physical and emotional injuries, and other damages and losses as described herein entitling them to compensatory and special damages. Plaintiffs are further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

435.   The aforesaid actions were done intentionally or committed with reckless or callous disregard for the Plaintiffs' rights.

436.   Plaintiffs are entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment for the Plaintiffs and against the Defendants and each of them as follows:

1.   Compensatory damages, including lost income, damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount of $60,000,000 or such greater amount as may be set by a jury.

2.   Economic losses, including lost wages in an amount exceeding $20,000,000, medical expenses, and related expenses on all claims allowed by law.

3.   Attorneys' fees and the costs associated with this action under 42 U.S.C. §1988, including expert witness fees, on all claims allowed by law.

4.      Punitive Damages.

5.      Pre- and post-judgment interest at the lawful rate.

6.      Any further relief that this court deems just and proper, and any other appropriate

relief at law and equity.

### JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a

trial by jury.

Dated this _____ day of July 2018.

**VIAL FOTHERINGHAM LLP**


_/s/ Edward W. McBride, Jr._
Edward W. McBride, Jr.