MARK L. SHURTLEFF (4666)
SHURTLEFF LAW FIRM PC
P.O. Box 900873
Sandy, Utah 84090
801-441-9625 (cell)
mark@shurtlefflawfirm.com
*Attorney for Plaintiffs*

---

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **MARK L. SHURTLEFF, ET AL,** **Plaintiffs,** v. **SALT LAKE COUNTY DISTRICT ATTORNEY SIM GILL, ET AL,** **Defendants.** | **PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS** **<u>Oral Argument Requested</u>** **Civil No.: 2:18-cv-00445 CW Judge: Clark Waddoups** |

Plaintiffs Mark L. Shurtleff (hereafter "Plaintiff"), M'Liss Marler Shurtleff (hereafter "M'Liss"), Thomas James Shurtleff (hereafter "Thomas"), and Adrianna Caroline Shurtleff (hereafter "Adrianna") by and through counsel, hereby submit their revised memorandum in further response to respond to the Federal and County Defendants' Motions to Dismiss:

### INTRODUCTION

On July 17, 2019, oral argument was heard on Defendants' Motions to Dismiss. At the conclusion of argument, the court directed plaintiffs to file a revised brief using the proper legal standard.

### STANDARD OF REVIEW

In considering a motion to dismiss, all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to the

non-movant. *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir. 1997). It is well established by the United States Supreme Court in clarifying the federal pleading standard set forth by Congress in Rule 8 of the Federal Rules of Civil Procedure, that to survive a motion to dismiss, a plaintiff's complaint need only allege enough facts, taken as true, to make his claim for relief "plausible on its face.' *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, Supra at 570, 127 S.Ct.1955 (2007).

As stated by the court during oral argument, when a defendant raises an affirmative defense of qualified immunity, the burden rests with the plaintiff to show that the defendant's actions fall outside the scope of the immunity. *See Weigel v. Broad,* 544 F.3d 1143, 1151 (10th Cir.2008). In determining whether the plaintiff has made that showing, the district court considers whether the facts taken in the light most favorable to the plaintiff show that the defendant's conduct violated a constitutional right. *Fogarty,* 523 F.3d at 1155 (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

In Poolaw v. Marcantel, 565 F.3d 721, 729, 2009 U.S. App. LEXIS 9483, *10, the Tenth Circuit set forth the standard for reviewing *de novo* the issuing court's ruling on the sufficiency of the warrant.

> We will uphold a warrant if the issuing judge had a "substantial basis for conclud[ing] that a search would uncover evidence of wrongdoing." *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quotations omitted); *accord United States v. Grimmett,* 439 F.3d 1263, 1268 (10th Cir.2006).
>
> "In determining whether probable cause exists to issue a warrant, the issuing judge must decide whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Grimmett,* 439 F.3d at 1270 (quotation omitted); *see also United States v. Harris,* 369 F.3d 1157, 1165 (10th Cir. 2004) ("Probable cause exists when the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched." (quotation omitted)). But, a court may not "arrive at probable cause simply by piling hunch upon hunch." *United States v.*

*Valenzuela,* 365 F.3d 892, 897 (10th Cir.2004). We assess the validity of the warrant "on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing [judge]," *Maryland v. Garrison,* 480 U.S. 79, 85, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987); *see Wilkins v. DeReyes,* 528 F.3d 790, 802 (10th Cir. 2008), looking both at the facts that support probable cause and those that militate against it, *Valenzuela,* 365 F.3d at 897.

The Tenth Circuit in Taylor v. Meacham, 82 F.3d 1556, 1562, 1996 U.S. App. LEXIS 10465, *15 held that "an arrest warrant must be supported by probable cause to comply with the Fourth Amendment. 'Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime.' Wolford, 78 F.3d at 489 (citing Fed. R. Crim. P. 4; Wong Sun v. United States, 371 U.S. 471, 481 n.9, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963))."

Here, as in Taylor, Plaintiffs allege that Search Warrant Affidavit 158 (hereafter "SWA 158") contained false and misleading statements and omitted material information thereby misleading the judge into issuing the arrest warrant.

> It is a violation of the Fourth Amendment for an arrest warrant affiant to `knowingly, or with reckless disregard for the truth,' include false statements in the affidavit.' Id. (quoting Franks v. Delaware, 438 U.S. 154, 155-56 (1978)). Similarly, it is a Fourth Amendment violation to 'knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause.' Id. (citing Stewart v. Donges, 915 F.2d 572, 581-83 (10th Cir. 1990)). If an arrest warrant affidavit contains false statements, 'the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit. Id. Where information has been omitted from an affidavit, we determine the existence of probable cause' `by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.'' Id. (quoting Stewart, 915 F.2d at 582 n. 13)."

Taylor v. Meacham, 82 F.3d 1556 at 1562.

## STATEMENT OF FACTS

During the July 17, 2018 hearing, Judge Waddoups gave Plaintiffs the opportunity to submit this revised briefing and in doing so suggested that they set forth each allegation in the

subject search and arrest warrants which they alleged contained false or misleading information, or information that had been omitted.

The following chart provides a numerical list of allegations in SWA 158 in which Agent Nesbitt (with the assistance of, and allegations provided by, other members of the joint FBI and Utah SBI task force including Defendants Pickens and Isakson) used false statements, misrepresentations and material omissions to unlawfully obtain a search warrant to invade Plaintiffs' home. The right column lists facts alleged in the Amended Complaint that were false, omitted or misrepresented to the magistrate judge.

The Amended Complaint also alleges constitutional violations in the issuance of the arrest warrant on Mr. Shurtleff which was based upon a warrant affidavit also filed by Defendant Nesbitt with the assistance and under the direction of other named Defendants. Most of the same false, misleading and omitted facts presented here were also contained in that warrant affidavit and for the same reasons articulated here, Defendants should not be protected by qualified immunity from liability for those constitutional violations in issuance and execution of the arrest warrant.

## I.   THE TASK FORCE MISLED THE COURT ABOUT MR. SHURTLEFF'S ROLE IN MARC S. JENSON'S CRIMINAL PROSECUTION IN 2005-08.

### A.   The truth (as alleged in the Amended Complaint) is that Mr. Shurtleff did not improperly influence plea negotiations in Mr. Jenson's criminal case. Instead, Mr. Shurtleff insisted that prosecutors reach a fair resolution that adequately protected victims of Mr. Jenson's crimes.

| SWA 158 | AMENDED COMPLAINT |
|---|---|
| 8. Charlene Barlow told your affiant that she was assigned to prosecute the case against Marc Jenson and that she filed the charges against Marc Jenson. Charlene Barlow told your affiant that as the case was proceeding, she heard that Mark Shurtleff was concerned about the case. Charlene Barlow told your affiant that she attended a meeting with Mark | 125.   Plaintiff participated in Mr. Jenson's prosecution at early stages of the criminal case, in part because the case involved serious allegations and millions of dollars in restitution and in part because some of Mr. Jenson's victims first lodged their complaints with Plaintiff. |

Shurtleff (Utah Attorney General), Scott Reed (Criminal Division Chief), Kirk Torgensen (Chief Deputy), and others about the case. Charlene Barlow told your affiant that Mark Shurtleff told her that he had been informed that the case was weak and that he was worried about being embarrassed if the case turned out bad.

9. Charlene Barlow told your affiant that she had never heard of Mark Shurtleff getting involved in any case before, and she worked for the Utah Attorney General's Office for over 20 years. Charlene Barlow told your affiant that she laid out the case for Mark Shurtleff and explained to him that the case was strong with good witnesses. Charlene Barlow told your affiant that Mark Shurtleff did not seem convinced but told her to proceed with the case if she felt that the case was strong.

10. Charlene Barlow told your affiant that before the case against Marc Jenson was resolved, the Utah Attorney General's Office received a complaint about Marc Jenson's involvement in the Mount Holly project, and she forwarded the complaint to the Utah Division of Securities for investigation. The Mount Holly project involved Marc Jenson and others soliciting investments to construct a ski resort and golf course in Beaver County, Utah. Charlene Barlow told your affiant that the weekend before the trial was to begin for the case she filed against Marc Jenson; she saw a big article in the news media regarding the case. Charlene Barlow told your affiant that the article mentioned behind the scenes information about Mount Holly and that Mark Shurtleff had met with Marc Jenson. Charlene Barlow told your affiant that she heard rumors that Marc Jenson offered to help Mark Shurtleff with his election if Mark Shurtleff would make the case go away.

11. Charlene Barlow told your affiant that before the trial was to begin, Kirk Torgensen told her that Mark Shurtleff was not comfortable with the case. Charlene Barlow told your affiant that it became clear to her that Scott Reed or Kirk Torgensen would try to pull the plug on the case. Charlene Barlow told your affiant that the week before the trial was to begin; Scott Reed told her that Mark Shurtleff had told him to offer Marc Jenson anything to make the case go away. Charlene Barlow told your affiant that Scott Reed started working on a plea in abeyance agreement to which she strongly objected because the case was

130.    Charlene Barlow, Kirk Torgensen, and Scott Reed, among others in Plaintiff's office, participated in the evaluation of the case, its prosecution, and plea negotiations.

131.    Part of the responsibilities of the Attorney General's office is to enter into plea arrangements with Defendants.

132.    Several of the witnesses in Marc Jenson's case did not have "clean hands" and their credibility was impeachable.

133.    The prosecutors were aware of the strengths and weaknesses of the case.

134.    Plea negotiations were ongoing between Mr. Jenson's attorney, Barlow, Torgensen, and Reed.

135.    Mr. Reed presented a plea in abeyance offer to Mr. Jenson's attorney that did not require payment of restitution. Mr. Reed confirmed that this offer was not sanctioned by Plaintiff.

136.    Plaintiff Mark Shurtleff rejected the deal and insisted on full restitution to Mr. Jenson's victims and jail time if not paid within a three year period of time.

137.    Mr. Reed's initial offer for a plea in abeyance and no restitution was rejected by the Judge presiding over Mr. Jenson's case.

138.    A second plea in abeyance was negotiated on this case between Mr. Reed and Mr.Jenson's attorney, in which Mr. Jenson agreed to pay full restitution of $4,100,000.

147.    Defendants accepted Jenson's "story" as absolute truth, even though Jenson could not articulate or offer any evidence of a quid pro quo.

151.    Plaintiff fully disclosed the plea offer to Defendant Pickens of the FBI, along with an explanation of why the Attorney General's office extended a plea in abeyance for three years that required payment of full restitution to Mr. Jenson's victims.

152.    Defendants Nesbitt with the knowledge and assent of Pickens and Isakson, and in collaboration

solid. Charlene Barlow told your affiant that she had never seen a high profile case like this result in a plea in abeyance agreement, and Scott Reed told her that Mark Shurtleff had ordered him to do the plea deal. Charlene Barlow told your affiant that she refused to offer the plea in abeyance and said she would quit before she would do so. Charlene Barlow told your affiant that Scott Reed made the plea offer.

12. On or about October 31, 2013, Scott Reed provided some emails to Special Agent Jon Isakson of the Federal Bureau of Investigation regarding Mark Shurtleff's involvement in the Marc Jenson plea negotiations. The emails were dated December 13, 2007, and they were between Scott Reed, Kirk Torgensen, and Mark Shurtleff using their state email accounts. One of the messages was from Mark Shurtleff to Scott Reed and Kirk Torgensen, and it read in part "You should know that in conversations with his civil attorney  Mark James and some others, I suggested I would seriously consider a plea in abeyance. i will send a copy down to you today through in-house mail. In short, he offers to plead 'no contest' to three thirds, pay a $15,000 fine to Securities Division, make restitution and serve a three month abeyance. For reasons I will be happy to explain in person, I am intent on accepting a no contest plea in abeyance to three third degree felonies, but obviously there needs to be a longer abeyance period and more restitution and perhaps a heftier fine ...The question I would like you, Kirk and Charlene to consider is if we could require a longer period but run it retroactively to some date (i.e. bind-over, or something)...I'm sure this email will be viewed as capitulation on my part and I would like to discuss this whole thing at length but I wanted to get started on this while 1am recovering from my additional surgery tomorrow. Please know that I am not succumbing to bribes or threats. This has to do with the fact that among the dozens of conversations I've had with Jensen supporters, a few I deemed to be credible, sincere and not motivated by a financial interest or tie to Jensen; the problems with our witnesses which may, or may not, be kept from the jury; and my own conversations with Jensen and my conclusion that he will be very believable to a jury.

19. On or about May 1, 2008, Marc Jenson attempted to enter into the plea in abeyance agreement that included him paying a $15,000 fine, no restitution, and no term of incarceration. The plea was presented

with Gill and others in his office, knowingly and maliciously misrepresented the facts and circumstances surrounding negotiation of the plea deal by inaccurately attributing the terms and language of the plea in abeyance to Plaintiff and failing to disclose that Plaintiff insisted that full restitution be paid to victims throughout the course of negotiations.

153.    There was nothing inappropriate about how the plea deal was handled. When Barlow complained about the terms of the deal to the task force, they seized on the opportunity to turn what was nothing more than some disagreement over a prosecutor's discretion into a criminal witch hunt. They purported to believe Marc Jenson despite knowing that in fact he wasn't telling the truth.

178.    Defendant Nesbitt, with the knowledge, assistance and support of Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill, and others in his office, failed to inform the Magistrate of the contents of an interview with Charlene Barlow, a prosecutor in the Marc Jenson matter, where Ms. Barlow indicated that she did not have personal knowledge of a quid pro quo agreement between Plaintiff and Mr. Jenson, and that she did not think that it was unethical that Plaintiff wanted a plea in abeyance instead of a trial.

185.    Defendants Nesbitt, Pickens, Isakson, Gill, and other members of Gill's office lacked any direct evidence that Mr. Jenson or related persons or entities contributed to Plaintiff's campaign as a purported quid pro quo, let alone the dismissal of the criminal charges against Mr. Jenson

to Judge Robin Reese of the Third District Court in Salt Lake City, and Scott Reed represented the state. Judge Robin Reese rejected the plea as too lenient and asked Scott Reed if it truly served the interests of justice. Scott Reed told Judge Robin Reese that the plea agreement did not serve all of the interests of justice.

20. On or about May 29, 2008, Marc Jenson entered into a revised plea in abeyance agreement that involved him paying a $15,000 fine and $4,100,000 in restitution that had to be paid within the 36 month plea in abeyance term. The plea agreement also allowed Marc Jenson to continue his involvement in the Mount Holly project. Marc Jenson did not pay any restitution during the 36 month period.

119. During the interview with Special Agent Isakson, Mark Shurtleff said that Charlene Barlow was concerned about her witnesses in the Marc Jenson case. However, Charlene Barlow told the F.B.I. Agents, as well as Scott Reed and Kirk Torgensen, that she had confidence in her witnesses and believed her case against Marc Jenson was strong. The F.B.I. has copies of multiple e-mails to Mark Shurtleff that show how confident Charlene Barlow was with the case and her witnesses.

121. Marc Jenson told Special Agent Isakson that he hired Timothy Lawson to persuade Mark Shurtleff to drop charges against him. Mark Shurtleff did not tell the F.B.I. in 2007 that Timothy Lawson was trying to persuade him to drop the charges against Marc Jenson. Mark Shurtleff also never mentioned that Robert Stahura was attempting to influence him to drop the charges against Marc Jenson.

127. During the interview with Special Agent Isakson, Mark Shurtleff claimed Charlene Barlow pulled herself off the Marc Jenson case because she lost confidence in the case. Charlene Barlow told your affiant that she had never seen a high profile case like this result in a plea in abeyance agreement, and Scott Reed told her that Mark Shurtleff had ordered him to do the plea deal. Charlene Barlow told your affiant that she refused to offer the plea in abeyance and said she would quit before she would do so. Charlene Barlow told your affiant that Scott Reed made the plea offer.

Paragraph 11 appears to be drawn largely from Ms. Barlow's FBI interview. Agent

Nesbitt includes a misleading inference insofar as it is not clear from the FBI interview whether the plea in abeyance should be attributed to Mr. Shurtleff or Mr. Reed. In short, this paragraph illustrates how Agent Nesbitt construed testimony and interviews to fit a particular theory of the case, even if that theory was inaccurate.

In Paragraph 12 Agent Nesbitt intentionally misconstrues the email, which states: "In sum, I'm okay with a shorter abeyance period but think he should pay a bigger financial penalty…My biggest concern is that Charlene will think I don't trust her or value all of her outstanding work on this case, so please discuss it with Charlene." In addition, Agent Nesbitt left out facts from other emails at the time that demonstrated that the no restitution plea agreement was solely Mr. Reed's doing and that Mr. Shurtleff was unaware of those emails.

Agent Nesbitt intentionally and improperly attempts to create a negative inference that the judicial finding surrounding the proposed plea agreement, which was negotiated by Mr. Reed and Mr. Skordas, should be attributed to Mr. Shurtleff.

In paragraph 121 of SWA 158, Agent Nesbitt deliberately mischaracterized Mr. Shurtleff's statement. In response to a question regarding Ms. Barlow's decision to leave the case, Mr. Shurtleff stated: "I think I assumed it was because Charlene wanted to go forward and didn't have confidence or something didn't feel like she had-I-she had my confidence[.]  I don't know  if she ever told me that or Scott told me that or whatever[.]"

Through the affidavits, Agent Nesbitt mischaracterizes statements in an attempt create a false inference that Mr. Shurtleff provided false information to the FBI. Paragraph 127 illustrates the defects in Agent Nesbitt's inflammatory characterizations, which were inconsistent with the underlying facts as fully alleged in the Amended Complaint.

**B.      The Task Force intentionally mischaracterized and omitted material facts relating to Mr. Jenson prosecution in order to obtain search warrants.**

| SWA 158 | AMENDED COMPLAINT |
| --- | --- |
| 13. According to information provided to your affiant by Special Agent Jon Isakson, on October 12, 2007 and October 19, 2007, the Federal Bureau of Investigation recorded, with Mark Shurtleff's consent, two in-person meetings between Mark Shurtleff and an employee of Marc Jenson, Paul Nelson. Certain portions of these recordings support probable cause to believe that Paul Nelson offered Mark Shurtleff campaign contributions in exchange for Mark Shurtleff's dismissal of the charges against Marc Jenson. | 154.      Plaintiff acted as a confidential informant in an FBI investigation involving Paul Nelson, an affiliate of Marc Jenson. |
| | 155.      In September 2007, Plaintiff was hospitalized for injuries that he received in a serious motorcycle accident. Paul Nelson visited Plaintiff's hospital room. Finding Plaintiff heavily sedated, Mr. Nelson informed Plaintiff that Marc Jenson and his friends could raise hundreds of thousands if not a million dollars in campaign contributions if Plaintiff would dismiss the charges against Mr. Jenson. |
| 14. According to information provided to your affiant by Special Agent Jon Isakson, during the October 12, 2007 meeting, Paul Nelson encouraged Mark Shurtleff to dismiss the charges against Marc Jenson for a number of reasons, including: Paul Nelson's belief that it was "the right thing to do;" Marc Jenson is a good person and respected in the community; Marc Jenson is innocent; and Mark Shurtleff could receive significant campaign contributions in return. Several times during the October 12, 2007 meeting, Paul Nelson referenced Mark Shurtleff's ability to become "friends" with Marc Jenson and his New York investors. Paul Nelson explained to Mark Shurtleff that the "new friends" would provide Mark Shurtleff with a significant amount of campaign contributions. Paul Nelson continued his effort to persuade Mark Shurtleff to dismiss the charges against Marc Jenson by, among other things, offering things of value in a follow up meeting. | 156.      Mr. Nelson threatened Plaintiff's political future if he failed to dismiss Mr. Jenson's case. Specifically, Mr. Nelson indicated that Mr. Jenson's investors in New York would raise money against Plaintiff in the 2008 election, and that Mr. Greg Skordas (Mr. Jenson's attorney) and Scott Reed, a prosecutor assigned to the case, were conspiring to "mount a campaign" against Plaintiff if the charges were not dismissed. |
| | 157.      Shortly after Mr. Nelson's visit, Plaintiff reported Mr. Nelson's attempt to bribe and coerce him to the FBI through his Chief of Investigation, Ken Wallentine. |
| | 158.      After Plaintiff reported Mr. Nelson's attempt to improperly influence him in the hospital, the United States Attorney's Office for the District of Utah and the FBI opened a formal criminal investigation of Mr. Nelson and Mr. Jenson that included potential federal charges of Bribery of a Public Official, Interstate Communications, and Wire Fraud. |
| 15. According to information provided to your affiant by Special Agent Jon Isakson, during Mark Shurtleff and Paul Nelson's in-person meeting on October 19, 2007, Paul Nelson continued to attempt to persuade Mark Shurtleff to dismiss the UAGO's charges against Marc Jenson. Paul Nelson continued to couch his statements in terms of doing "the right thing" and Mark Shurtleff working to gain "new friends;" Paul Nelson also described exactly how significant the campaign contributions to Mark Shurtleff would be if he dismissed the charges against Marc Jenson. By way of example, Paul Nelson explained it would not be | 159.      Defendant Pickens was assigned to lead that investigation, communicating frequently with Plaintiff. |
| | 160.      The FBI, Pickins and Assistant United States Attorney Barbara Bearnson instructed Plaintiff to initiate further communications between Plaintiff and |

difficult for Marc Jenson to guarantee over $500,000 in the course of three months.

120. During the interview with Special Agent Isakson, Mark Shurtleff claimed he did not know that Timothy Lawson was being paid by Marc Jenson to persuade him (Mark Shurtleff) to drop the charges against Marc Jenson in the time period before Marc Jenson's plea deal. However, in an e-mail sent in August 2007, Mark Shurtleff told Scott Reed that Marc Jenson had offered "set for life money" to a friend if he can convince Mark Shurtleff to drop charges against Marc Jenson.

Mr. Nelson and that those communications be recorded.

161.    Plaintiff participated as he was instructed by Defendant Pickens as the FBI's confidential informant in a sting operation that resulted in two recorded meetings and the collection of more than 140 text messages.

162.    As part of the sting operation, Plaintiff provided the FBI with text messages between Plaintiff, Mr. Nelson, Mr. Jenson, and Mr. Skordas. Plaintiff also sent several text messages to Mr. Nelson, Mr. Jenson, and Mr. Skordas with the full knowledge and, at times, direction of the FBI, specifically Defendant Pickens.

163.    The text messages, sent when Plaintiff was acting as a confidential witness, were used in Defendants' applications for the search and arrest warrants.

164.    Defendants Gill, Nesbitt, Pickens and Isakson falsely and maliciously alleged that Plaintiff was complicit in Mr. Jenson's scheme in expressing a willingness to accept money or avoid threats made against him in exchange for dismissal of criminal charges.

165.    Far from being complicit in Mr. Jenson's scheme, Plaintiff was not involved in any criminal activity with Mr. Jenson.

166.    Instead, Plaintiff actively informed authorities of unlawful efforts to improperly influence a pending criminal case and then played a critical role as a confidential informant in the subsequent investigation.

167.    In the search warrant application, Defendant Nesbitt, with the assistance of Pickens and Isakson, outlined the fact that there were recordings between Paul Nelson and Plaintiff.

168.    Defendant Nesbitt highlighted the fact that in the recordings, Paul Nelson had offered Plaintiff campaign contributions in excess of $500,000 in the course of three months in exchange for Plaintiff's dismissal of the charges against Marc Jenson.

169.    Defendant Nesbitt did not attribute any of the

recordings to what they were - - Plaintiff, as a confidential informant working at the request of the FBI to gather evidence against Paul Nelson and Marc Jensen.

170.    Defendant Nesbitt failed to inform the Court that the recording of Plaintiff was done while he was acting as a confidential witness in a bribery sting operation.

171.    Part of the assignment where he was working as the confidential informant was to attempt to have Paul Nelson repeat the earlier bribery offer.

172.    Rather than providing this context, Defendant Nesbitt purposely withheld this information from the Court so that the Court would issue the warrant.

173.    Upon information and belief, if the full context of the recording were provided to the Court, the search warrant would not have been issued and the criminal charges never filed.

174.    The FBI knew that the offer of payment for the dismissal of charges against Marc Jenson was done in connection with Plaintiff as a confidential informant.

175.    On information and belief, the FBI based in Utah provided State agencies with access to the files containing accurate information about Plaintiff's role in its investigation of Mr. Jenson's attempts to improperly influence his criminal case.

176.    Defendants Pickens, Isakson, Nesbitt and Gill and the other County Defendants had access to a complete history of Plaintiff's participation in the sting operation.

177.    On November 19, 2008, months after Mr. Jenson's plea agreement, the Department of Justice declined to prosecute Mr. Jenson and Mr. Nelson for attempted bribery and related crimes.

179.    Mr. Jensen's plea in abeyance was entered while the bribery sting operation targeting Mr. Jenson and Mr. Nelson was still underway and well before federal authorities made their charging decision against Mr. Jenson and Mr. Nelson in connection with their scheme.

180.    According to federal authorities, the bribery scheme was not prosecutable because Mr. Nelson had "qualified" his offers with language that Mr. Jenson was innocent and the funds would be available to Plaintiff if he "did the right thing." The federal authorities did not specifically address Mr. Nelson's threats against Plaintiff.

181.    Defendants Isakson and Pickens possessed personal knowledge about the investigation into Mr. Jenson's and Mr. Nelson's conduct with the cooperating assistance of Plaintiff. Without Plaintiff's cooperation, no information would have been available.

182.    Prior to filing charges against Plaintiff, Defendants Nesbitt, Gill, and the other County Defendants knew Plaintiff was a victim and confidential informant in the federal investigation, but also contained correspondence and recordings that undermined the SLCPCTF's narrative of Mr. Nelson's scheme and plea negotiations.

183.    Defendants Nesbitt, Gill, and the other County Defendants omitted critical information from the search warrant affidavits and the probable cause statement in support of the criminal information, about Plaintiff's collaborative role in a federal investigation of Mr. Jenson and Mr. Nelson.

184.    Defendant Gill and others in his office knew of the false and omitted information and that they lacked probable cause to bring the charges in the initial criminal information against Plaintiff.

186.    Defendants Nesbitt, Pickens, Isakson, Gill, and other members of Gill's office nevertheless painted a false and inaccurate narrative of Plaintiff's role in the sting operation to the magistrate and the public.

187.    The only way for Defendants to secure a search warrant was to misrepresent the aforesaid information to Judge Trease.

188.    Information about the sting operation led by Defendant Pickens was not contained in the search warrant affidavit provided by Nesbitt. In fact, Nesbitt swore in the July 5, 2014 affidavit filed with the court that the affidavit was reviewed for accuracy by

|  | Special Agent Isakson, Special Agent Ulsh, and or Supervisory Special Agent Pickens. |
|---|---|

In paragraphs 13 through 15 of SWA 158 Agent Nesbitt failed to acknowledge - let alone discuss - Mr. Shurtleff's critical role in instigating the federal investigation and participating as a confidential informant. He also attempts to give the magistrate a false and misleading inference - that Mr. Shurtleff would be willing to accept contributions in exchange for dismissal. In fact, the opposite is true—Mr. Shurtleff consistently refused to dismiss the charges.

Paragraph 120 contains a false syllogism. The use of the word "however" creates a misleading impression that Mr. Shurtleff knew that Mr. Lawson actually received payment from Mr. Jenson to unduly influence the Attorney General's Office during his FBI interview, and that Mr. Shurtleff lied about the existence of the offer. In reality, Mr. Shurtleff not only openly discussed the email during the interview, but also provided FBI agents with specific names of other individuals who attempted to influence Mr. Jenson's prosecution.

## II.   THE TASK FORCE FABRICATED AN IMPROPER CONNECTION BETWEEN MR. SHURTLEFF AND MENTORING OF AMERICA.

| SWA 158 | AMENDED COMPLAINT |
|---|---|
| 16. According to information provided to your affiant by Special Agent Jon Isakson, not long after the charges were filed against Marc Jenson, Paul Nelson contacted Timothy Lawson, a fundraiser and good friend of Mark Shurtleff, and requested that Timothy Lawson help persuade Mark Shurtleff to drop the charges against Marc Jenson. Around this time, Timothy Lawson worked for a call-center (telemarketing) company called Mentoring of America (MOA). MOA was the subject of three fraud investigations by the Utah Division of Consumer Protection that resulted in administrative citations and one enforcement action. Executives of MOA met with Mark Shurtleff, and MOA donated money to Mark Shurtleff s campaign.<br><br>17. On January 7, 2008, Mark Shurtleff wrote an email to his secretary Helen Petersen, "Helen, can you please call Marsha Oriti ... at Mentoring of America | 218.    Mentoring of America, LLC ("MOA") was a Utah-based call-center company and a contributor to Plaintiff's campaign.<br><br>219.    Timothy Lawson worked for MOA.<br><br>220.    On or about November 1, 2008, MOA contributed $2,500 to Plaintiff's second re- election campaign for Attorney General.<br><br>221.    MOA was but one of hundreds of individuals or entities that contributed to Plaintiff's 2008 campaign.<br><br>222.    In affidavits in support of search warrants, Defendants Pickens, Isakson and Nesbitt, with the assistance, review and/or final approval of Defendant Gill and other Salt Lake County employees distorted the relationship between Plaintiff and MOA. |

HQ in California and set up a lunch meeting with CEO Doug Gravink and COO Gary Hewitt. For next week? [sic] They will fly up here for the meeting (and bring me another $15K.) Marsha is expecting your call. I suggest Market St. Grill (unless Tim has a better idea.) Please call Tim and let him know date and time after you set it up. Thanks!" Timothy Lawson was copied the e- mail at fullnester1@netzero.com. Campaign records  show that from August 2007 through November 2008, Mark Shurtleff received a total of $12,500 from MOA. Robert Stahura was a managing employee of Mentoring of America, According to filed court documents, the Federal Trade Commission (FTC) filed a complaint against MOA, Douglas Gravink, Gary Hewitt, and others in June of 2009 in the United States District Court in the Central District of California.

18. On February 29, 2008, Timothy Lawson sent an e-mail to Mark Shurtleff with an attachment labeled "Bullet Points." The text of the e-mail from Timothy Lawson reads, "All I would like you to do bro is review this." The e-mail was sent from Timothy Lawson's fullnester@yahoo.com e-mail account to Mark Shurtleffs [sic] state email account. The "Bullet Points" attachment contains a list of suggested changes to the plea deal that was being worked on by the Utah Attorney General's Office. The attachment suggests that Marc Jenson would be willing to agree to a plea in abeyance if it included a reduction, if not elimination, of the amount of restitution that Marc Jenson owed to his victims. The attachment also requests an allowance for Marc Jenson to continue working on the Mount Holly Project, even though it would require lending and borrowing-funds.

223.    MOA was the subject of three fraud investigations by the Utah Division of Consumer Protection that resulted in administrative citations and one enforcement action in 2006.

224.    The affidavits misrepresented to the court the timing and amount of donation, in addition to alleging that the donation amounted to some sort of bribe from MOA to Plaintiff's re- election campaign in November 2008.

225.    The affiants (Defendants Pickens, Isakson, and Nesbitt) failed to mention the fact that the investigation into MOA had concluded two years before the donation to Plaintiff's campaign.

226.    Defendants knew that there was nothing illegal about the donation.

227.    Defendants misrepresented the date and scope of the investigation for the purpose of misleading the Court

228.    After unlawfully securing the search warrant, Defendants held a press conference and took other measures to share their version of the investigation with the media.

229.    Defendants' actions were calculated to cause the maximum damage to Plaintiff and his family.

230.    Defendants Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Defendant Gill and other members of his office, without any evidence in support of such a connection, fraudulently suggested there was a link between MOA's lawful campaign contribution and Marc. Jenson's criminal case.

231.    Defendants Pickens, Isakson, Nesbitt, Gill, and other members of his office all knew there was no relationship between MOA and Mr. Jenson.

232.    Defendants Pickens, Isakson, and Nesbitt knew that the amount and timing of contributions demonstrated there was not the connection falsely suggested in the affidavits.

233.    Defendants Pickens, Isakson and Nesbitt willfully or negligently failed to interview MOA

|  | executives, whom are referenced by name in the affidavits (and none of whom are Tim Lawson or Marc Jenson), to verify whether there was a connection between the company and Mr. Jenson. |
|  | 234.   Instead, Defendants Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Defendant Gill and other members of his office included in, and signed off on, the misleading statements in the affidavits about MOA for the express purpose of furthering a false narrative about Plaintiff's tenure as Attorney General. |
|  | 235.   Similarly, Defendants Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Defendant Gill and other members of his office compounded this error by omitting or misconstruing the timeline of the allegations surrounding MOA. |

Agent Nesbitt intentionally or recklessly confused the timeline of events in order to create a causal connection, when in fact no such causal or temporal connection existed. Further, Agent Nesbitt intentionally misconstrued events surrounding the Tim Lawson email. Agent Nesbitt knew, but failed to tell the magistrate judge, that Mr. Shurtleff forwarded the email to Mr. Reed and Mr. Torgensen, after which Mr. Shurtleff informed other prosecutors that Mr. Lawson's email was inappropriate. Instead, Agent Nesbitt and the Salt Lake District Attorney's Office included in the affidavits misleading statements about Mentoring of America for the express purpose of furthering a false narrative about Mr. Shurtleff's tenure as Attorney General. Agent Nesbitt compounded this error by omitting or misconstruing the timeline of the allegations surrounding Mentoring of America for the purpose of suggesting improper conduct.

III.   **AGENT NESBITT CREATED A FALSE NARRATIVE SURROUNDING MR. SHURTLEFF'S VISIT TO CALIFORNIA BASED PRINCIPALLY ON STATEMENTS OF MR. JENSON WITHOUT ADEQUATELY DISCLOSING MR. JENSEN WAS SERVING A PRISON SENTENCE BASED ON HIS PROSECUTION BY MR. SHURTLEFF AND THAT HE WAS RECORDED THREATENING TO GET REVENGE PRIOR TO FIRST SPEAKING WITH MEMBERS OF THE TASK FORCE.**

| SWA 158 | AMENDED COMPLAINT |
|---|---|
| 21. According to receipts provided by Marc Jenson, between about May of 2009 and July of 2009, Mark Shurtleff, John Swallow, Suzanne Swallow, Nicole Lawson, Chelsea Lawson, and Timothy Lawson stayed at the Pelican Hill resort in California where Marc Jenson was living. John Swallow was the campaign fundraiser for Mark Shurtleff at that time. According to the receipts and statements made by Marc Jenson, Marc Jenson paid for them to stay at the luxury resort including paying for their massages, golf, food, and clothing. Mark Shurtleff, John Swallow, Suzanne Swallow and the others received these things at Marc Jenson's expense. Marc Jenson did not pay his court ordered restitution.<br><br>22. Your affiant obtained reports from Special Agent Jon Isakson of the Federal Bureau of Investigation. According to those reports, Marc Jenson told Special Agent Jon Isakson that prior to the plea in abeyance agreement being rejected, he heard Scott Reed say that it did not matter if restitution was ordered because they were going to charge him again with other charges. Marc Jenson told Special Agent Isakson that he became concerned and continued to pay Timothy Lawson to have access to Mark Shurtleff. Marc Jenson told Special Agent Jon Isakson that Timothy Lawson told him not to worry about Scott Reed and that Mark Shurtleff would take care of things from above. Marc Jenson told Special Agent Jon Isakson that Mark Shurtleff knew that he (Marc Jenson) was paying Timothy Lawson to contact people to get them to back off because they were complaining to the Utah Attorney General's Office.<br><br>23. Marc Jenson told Special Agent Jon Isakson that Timothy Lawson's value to him was his close friendship with Mark Shurtleff, and it was arranged through Timothy Lawson for Mark Shurtleff and John Swallow to visit him (Marc Jenson) and stay with him (Marc Jenson) at Pelican Hill. Marc Jenson told | 185.   Defendants Nesbitt, Pickens, Isakson, Gill, and other members of Gill's office lacked any direct evidence that Mr. Jenson or related persons or entities contributed to Plaintiff's campaign as a purported quid pro quo, let alone the dismissal of the criminal charges against Mr. Jenson.<br><br>189.   Defendants Nesbitt and Isakson and with the knowledge and assent of Pickens and Defendant Gill and other members of his office, interviewed Marc Jenson, who was serving a lengthy prison sentence.<br><br>190.   Marc Jenson had, in the nearly three years since his plea in abeyance revocation hearing, never once alleged unethical conduct by Plaintiff until his failed parole hearing.<br><br>191.   Defendants knew Marc Jenson harbored ill-will and was substantially biased against Plaintiff.<br><br>192.   Defendants knew that Marc Jenson made threats to "get revenge" on Plaintiff.<br><br>193.   Defendants Nesbitt, Isakson and Pickens were well aware of Mr. Jenson's threats because letters and recorded phone calls had been sent to Nesbitt at FBI headquarters in Salt Lake City from May 2012 through February 2013.<br>201.   Defendants further represented that on or about April 30, 2009, Marc Jenson paid Lawson one of the 18 payments in the amount of $6,190.00 to arrange and pay for trips for Plaintiff and John Swallow to the Pelican Hill Resort ("Pelican Hill"), a high-end resort in California, where Jenson was staying at the time.<br><br>202.   In the very next sentence of the affidavit and in charging documents, Defendants allege that Jenson directly paid for lodging and expenses including massages, golf, food, and clothing items at |

Special Agent Jon Isakson that the purpose of Mark Shurtleff and John Swallow's trip was to meet Marc Jenson's investor friends from New York and Los Angeles. Marc Jenson told Special Agent Jon Isakson that Mark Shurtleff told him that he wanted to meet his business associates to seek funding for his United States Senate campaign.

24. Marc Jenson told Special Agent Jon Isakson that Mark Shurtleff and John Swallow made two trips to Pelican Hill that he (Marc Jenson) fully funded. Marc Jenson told Special Agent Jon Isakson that during the trips, Mark Shurtleff apologized for what happened to him (Marc Jenson) and told him that if he had contributed to him (Mark Shurtleff's campaign) before the charges were filed, none of this would have happened. Marc Jenson told Special Agent Jon Isakson that Mark Shurtleff told him that if he would have been a contributor to his campaign, he would never have been in trouble in the first place. Marc Jenson told Special Agent Jon Isakson that it was very clear that in exchange for the trips and him introducing Mark Shurtleff and John Swallow to his friends he would never have problems in the state of Utah again.

25. Marc Jenson explained to Special Agent Jon Isakson that on at least one occasion in the summer of 2009, he (Marc Jenson) purchased airline tickets for Mark Shurtleff, John Swallow and Timothy Lawson by transferring funds into Timothy Lawson's bank account and having Timothy Lawson purchase the tickets. Marc Jenson explained that Timothy Lawson told Marc Jenson that the purchase had to be done that way to keep the trip secret. Marc Jenson's personal assistant, Peter Torres, booked the airfare for Timothy Lawson and sent an e-mail confirmation to Timothy Lawson's fullnester@yahoo.com account. Timothy Lawson replied to Peter Torres' e-mail on April 23, 2009 from the same e-mail account. At the bottom of the e-mail, Timothy Lawson included his e-mail account of adgillc@gmail.com as part of his signature. In the body of the e-mail, Timothy Lawson said "Thanks again for everything bro." Timothy Lawson e-mailed his bank account information to Peter Torres on August 28, 2009. This e-mail was sent from Timothy Lawson's "Apple Dumpling Gang" e-mail account, adgillc@gmail.com and included an attachment with bank wire instructions. In the body of the e-mail, Timothy Lawson told Peter Torres, "Hey bro, I had to close my adgi account because of all the

the Pelican Hill Resort for Plaintiff and John Swallow.

203.    On May 4, and 5, 2009, Plaintiff, in company with others and at the invitation of Tim Lawson, took a trip to Pelican Hill to work on his novel.

204.    Plaintiff returned to Southern California on his own June 5 through June 7, 2009, staying at a home belonging to a friend's parents to continue working on his novel with the goal of finishing it before the end of the year. That friend had no connection to Marc Jenson.

205.    Defendants failed to mention that these trips took place more than a year after Mr.
Jenson entered into his plea deal with the Court.

206.    Tim Lawson always maintained to prosecutors and investigators that he paid for the trip and that he told Plaintiff repeatedly that he paid for the three-day stay in May.

207.    Defendants Pickens, Isakson and Nesbitt alleged that Plaintiff knew that Marc Jenson had given Tim Lawson the funds to arrange and pay for the trips for the purpose of Plaintiff and Marc Jenson to meet.

208.    Defendants knew Plaintiff did not have any substantive communications with Mr.
Jenson during his stay at Pelican Hills Resort, other than to urge him to pay the restitution he agreed to as part of his plea in abeyance.

209.    Defendants Nesbitt with the knowledge and assent of Defendants Pickens and Isakson, and in collaboration with Defendant Gill and others in his office, falsely alleged that during his abeyance period Jenson was under supervisory probation with the Office of Attorney General.

210.    Nesbitt with the knowledge and assent of Pickens and Isakson, and in collaboration with Gill and others in his office, knowingly painted false and inaccurate narratives about the trips to the Magistrate in the affidavits for search warrants, in their declaration of probable cause, and to the public.

211.    Nesbitt with the knowledge and assent of Pickens and Isakson, and in collaboration with Gill,

| | |
|---|---|
| bounced checks etc ... Here is a clean account. If you have any questions let me know bro, and as usual, I got your back and believe in you 100%+10." According to Utah Department of Commerce records, Timothy Lawson is the Registered Agent and incorporator of the business Apple Dumpling Gang Investments. | and others in his office, knowingly and maliciously misrepresented that Plaintiff denied knowing, at the time, that Mr. Jenson may have surreptitiously contributed to the cost of the trip to Pelican Hills Resort.<br><br>212.    Nesbitt with the knowledge and assent of Pickens and Isakson, and in collaboration with Gill, and others in his office, willfully omitted from search warrant affidavits and the probable cause statement that Mr. Lawson never deviated from his immunized testimony that he paid for the trip and that he told Plaintiff repeatedly that he paid for the three-day stay in May of 2009.<br><br>213.    The search warrant affidavit was also "supported" by Jenson.<br><br>214.    Defendants used Jenson's testimony, which they knew was false, so that they could pursue the unfounded criminal charges and publicly disgrace Plaintiff and his family.<br><br>215.    Defendants knew that Plaintiff never received anything from Jenson.<br><br>216.    Defendants knew that Jenson never received anything from Plaintiff.<br><br>217.    Defendants knew that on November 3, 2011 Jenson was sentenced to up to ten years in prison on the charges brought by Plaintiff as Utah Attorney General. |

Agent Nesbitt lacked any direct evidence that Mr. Jenson or related persons or entities contributed to Mr. Shurtleff's campaign as a purported quid pro quo for anything, let alone the dismissal of the criminal charges against Mr. Jenson. Agent Nesbitt failed to mention that Mr. Shurtleff denied possessing any knowledge, at the time, that Mr. Jenson may have surreptitiously contributed to the cost of a trip to Pelican Hills approximately one year after the plea arrangement. Agent Nesbitt fails to highlight that his primary witness, Mr. Jenson, was serving a lengthy prison sentence at the time of his interview with members of the Task Force, or that Mr. Jenson harbored ill-will and was substantially biased against Mr. Shurtleff.

## IV.   AGENT NESBITT AND THE TASK FORCE MISREPRESENTED THE MIMI'S CAFÉ MEETING AND MISLED THE COURT FOR THE PURPOSE OF OBTAINING WARRANTS.

| SWA 158 | AMENDED COMPLAINT |
|---|---|
| 34. According to statements made by Darl McBride to your affiant and filed court documents, on or about March 26, 2009, a civil lawsuit was filed against Alison Robbins in the Third District Court in Salt Lake City by Darl McBride regarding a $105,000 check that was returned for insufficient funds. Mark Robbins and Alison Robbins had fled to California, and their exact location was not known. Darl McBride told Special Agent Jon Isakson that he had made two loans of $100,000 each to Mark Robbins who promised to repay them, and the $105,000 check was repayment of the second loan. Darl McBride told your affiant that Mark Robbins had promised him (Darl McBride) a job to run operations for him at Mark Robbins' company AIP. Darl McBride told your affiant that Mark Robbins told him that his base salary was to be $500,000 with $1,500,000 in bonuses. | 289.    On May 8, 2009, Darl McBride, a Utah-based entrepreneur, met with Plaintiff at Mimi's Café, a restaurant located in Sandy, Utah. Mr. McBride controlled the subject matter of the conversation, which he surreptitiously recorded without Plaintiff's knowledge or consent.

290.    Plaintiff rarely spoke during the course of the meeting. Plaintiff merely asked questions to clarify Mr. McBride's narrative of events. In a few instances, Plaintiff explained the background of Mr. Jenson's prosecution and his relationship to Tim Lawson.

291.    Mr. McBride spent the majority of the meeting explaining how he had lost substantial funds investing in a fraudulent scheme perpetrated by Mark Robbins, an entrepreneur who had connections to Marc Jenson. |
| 35. According to statements made by Darl McBride to your affiant, he created a website called Skyline Cowboy for the purpose of offering a reward for information about the whereabouts of Mark Robbins, so he could have lawsuit paperwork served. According to Skyline Cowboy site, Darl McBride posted many items about Mark Robbins not appearing in court, having a warrant out for his arrest, being the subject of a lawsuit, and being sought by the police. Darl McBride provided information to KSL News regarding Terry Diehl and Mark Robbins' involvement in the UTA situation. Before the Skyline Cowboy website went up and immediately after the KSL News story broke, Timothy Lawson called Darl McBride. Timothy Lawson told Darl McBride that he has been talking to Mark Shurtleff and that Mark Shurtleff wanted him (Darl McBride) to back off of Mark Robbins and that he was speaking in behalf of Mark Shurtleff. Darl McBride told Timothy | 292.    Mr. McBride accused Mr. Robbins of perpetrating a Ponzi scheme. He claimed that he had taken out loans to pay Mr. Robbins and that Mr. Robbins promised to pay back Mr. McBride but failed to do so. Mr. McBride further claimed that Mr. Robbins had perpetrated similar fraudulent schemes on other investors.

293.    In 2008, Mr. Robbins claimed that he was a victim of the fraudulent scheme at the heart of Mr. Jenson's criminal case. Prior to Mr. Jenson's plea in abeyance, prosecutors intended to use Mr. Robbins as a key witness in Mr. Jenson's trial.

294.    Mr. McBride claimed he had been threatened by Mr. Lawson if he moved forward with a plan to sue Mr. Jensen for lost investment funds.

295.    Plaintiff informed Mr. McBride that Mr. |

Lawson that he was not going to back off, and he put up the Skyline Cowboy website with a link to the KSL News story.

36. According to statements made by Darl McBride to your affiant, Timothy Lawson called him again using foul and abusive language telling him to take the Skyline Cowboy website down. Timothy Lawson told Darl McBride that if he did not back off of Mark Robbins and take the website down, he would be sitting in jail for a long time because Mark Shurtleff had things on him. Timothy Lawson told Darl McBride that he did not know who he was dealing with. Timothy Lawson told Darl McBride that he was Porter Rockwell for Mark Shurtleff and takes care of things for Mark Shurtleff like Porter Rockwell did. Timothy Lawson told Darl McBride that he was dealing with the wrong guy who has guns and Polynesian friends who like to bust people up. Timothy Dawson told Darl McBride that he spoke with Mark Shurtleff who said that those three things would happen if he did not back off. Darl McBride received those telephone calls from Timothy Lawson while in Salt Lake County.

37. According to statements made by Darl McBride to your affiant, about two weeks later, Mark Shurtleff called him and told him he wanted to meet with him at Mimi's Cafe on State Street in Sandy City. Mark Shurtleff and Darl McBride met there on about May 8, 2009, and the meeting was audio recorded by Darl McBride. Darl McBride provided a copy of the recording to the Federal Bureau of Investigation and your affiant listened to the recording. The recording revealed that during the meeting, Mark Shurtleff told Darl McBride that Timothy Lawson was a friend who he met while running for Attorney General. Mark Shurtleff acknowledged that he knew that Timothy Lawson uses his name and tells people that he represents the Attorney General. Mark Shurtleff told Darl McBride "He'll use me for different things".

38. The recording revealed that during the

Jenson and Mr. Robbins had been partners, and that Mr. Jenson was currently subject to a three-year plea in abeyance.

296.  Plaintiff indicated that Mr. Robbins was one of the witnesses in the criminal case against Mr. Jensen. Plaintiff informed Mr. McBride that issues relating to the credibility of Mr. Robbins undermined the strength of the criminal case against Mr. Jenson.

297.  Plaintiff agreed to look into Mr. McBride's concerns as he would those of any other Utah citizen seeking help from the elected Attorney General.

298.  Plaintiff did not discourage Mr. McBride in his pursuit of Mr. Robbins. Plaintiff encouraged Mr. McBride to pursue a variety of different forms of legal relief, including additional lawsuits against Mr. Robbins.

299.  Plaintiff had no financial or personal interest in resolving the dispute between the two businessmen in favor of Mr. Robbins.

300.  Plaintiff had no ability to cause Mr. Jenson to pay Mr. McBride, because the court ordered payment of restitution including specified victims, none of whom were Mr. McBride or Mr. Robbins.

301.  Defendants falsely suggested in the search warrant affidavit that the recording of the meeting contained a discussion in which Darl McBride told Plaintiff that he needed $2,000,000 and in which Plaintiff assured him that Marc Jenson was "good for it."

302.  Defendants Nesbitt, Pickens, Isakson and Gill knowingly and falsely alleged that Plaintiff attempted to persuade McBride to "back off".

303.  Defendants represented in the search warrant affidavit that Marc Jenson told Nesbitt that "he, Plaintiff and John Swallow met in

meeting, Mark Shurtleff told Darl McBride that he first knew of Mark Robbins during the prosecution of Marc Jenson. Mark Shurtleff told Darl McBride that Marc Jenson was always arguing that Mark Robbins was the real bad guy preventing him from paying people back. Mark Shurtleff told Darl McBride that Timothy Lawson had introduced him to people who became contributors to his campaign. Mark Shurtleff told Darl McBride that the Skyline Cowboy website was "pretty harsh" and was worried that Mark Robbins couldn't get any deals done if people saw that website. Mark Shurtleff acknowledged that what Mark Robbins was doing was a "Ponzi" scheme.

39. The recording revealed that during the meeting, Mark Shurtleff asked Darl McBride "What can I do?" Darl McBride told Mark Shurtleff that he needed $2,000,000, and Mark Shurtleff asked Darl McBride if he knew Marc Jenson. Mark Shurtleff told Darl McBride that that he believed that Mark Robbins was not good for it and believed that Marc Jenson was. Mark Shurtleff offered to make a call to either Mark Robbins or Marc Jenson to see if he could help out. Mark Shurtleff told Darl McBride "But you got your money, you got to promise us there can't be anything else from you. You know, it's just straight up." Darl McBride told your affiant that months after that meeting, Timothy Lawson sent him a text message that said that he was messing with the 12th richest man in the world and said in capital letters "YOU ARE GOING DOWN". Marc Jenson told your affiant that he, Mark Shurtleff, and John Swallow met together in California. Marc Jenson told your affiant that Mark Shurtleff told him that he needed to give $2,000,000 to Timothy Lawson for Timothy Lawson to give to Darl McBride because that was how much it would take to get Darl McBride to back off of Mark Robbins. Marc Jenson told your affiant that John Swallow was nodding his head during the conversation. Marc Jenson told your affiant that he had been involved in business dealings with Mark Robbins, and Mark Robbins

California and that Plaintiff told him that he needed to give $2,000,000 to Tim Lawson for Tim Lawson to give to Darl McBride because that was how much it would take to get Darl McBride to back off of Mark Robbins."

304.    Plaintiff had no logical reason to intervene in any settlement negotiations between Darl McBride, Mark Robbins, or Marc Jenson.

305.    Plaintiff had no financial or personal interest in resolving the dispute between the two businessmen in favor of Mr. Robbins.

306.    Mr. McBride later brought a civil case in the Third Judicial District Court, State of Utah, against Mr. Robbins for acts that allegedly occurred in 2012.

307.    Defendant Nesbitt, with the knowledge, assistance, and support of Pickens and Isakson, and the encouragement, assistance, and the formal approval of Gill and others in his office, falsely accused Plaintiff of soliciting a bride from Marc Jenson so that he could pay McBride to back off.

308.    Plaintiff did not attempt to discourage Mr. McBride's pursuit of Mr. Robbins. To the contrary, Plaintiff encouraged Mr. McBride to pursue a variety of different forms of legal relief, including additional lawsuits against Mr. Robbins.

309.    This allegation by Defendants in the Information of soliciting a bribe from Mr. McBride was an empty allegation and not supported by any evidence or fact. It was designed to cast doubt and suspicion on Plaintiff's otherwise stellar career.

310.    Defendants SLCPCTF and Pickens, Isakson, and Nesbitt, with the assistance, review and/or final approval of Gill and others, misrepresented the conversation that occurred at the Mimi's Café meeting in the hopes of

| owed him money. | obtaining search and arrest warrants and in bringing criminal charges against Plaintiff. |

Agent Nesbitt and the Task Force also materially omitted key portions of the enhanced transcript in an effort to mislead the court into issuing warrants. Among other things, the Task Force failed to include the following material information.

a.   The affidavits fail to mention that Mr. Shurtleff described Mr. Lawson as a "name dropper" and the fact that Mr. Shurtleff appears to have disavowed any knowledge or participation in Mr. Lawson's activities.

b.   The affidavits fail to mention that Mr. Shurtleff insisted that Mr. Lawson did not represent his interests, and that he had been instructed to stop representing that he could resolve issues through his connection to Mr. Shurtleff.

c.   The affidavits fail to mention that Mr. Shurtleff never authorized or condoned Mr. Lawson's conduct or representations to Mr. McBride.

Agent Nesbitt either intentionally or recklessly omitted information obtained from Mr. Robbins, who denied owing money to Mr. McBride and denied any allegation that Mr. Shurtleff approached Mr. McBride on his behalf.

Agent Nesbitt possessed information that Mr. Shurtleff denied that Mr. Lawson worked on his behalf. Despite that fact, he recklessly, intentionally, and misleadingly suggested throughout search warrant affidavits that Mr. Lawson worked for Mr. Shurtleff without sufficient supporting proof.

In fact, it was Mr. McBride who described the Ponzi scheme, and there was no firm acknowledgement from Mr. Shurtleff, in part because Mr. Shurtleff had little familiarity with Mr. Robbins's business activities at the time of the meeting, which Mr.

McBride pursued.

Mr. Shurtleff denies that he ever informed or instructed Mr. Jenson to pay $2,000,000 to

give to Mr. McBride. Agent Nesbitt improperly relied on this theory without conducting any

investigation. Indeed, the AG's Office recently obtained a determination from the Board of

Pardons that controverts this narrative. Jennifer Dobner, *Utah Parole Board: $4.1 Million Still

Owed by Businessman with Ties to Shurtleff, Swallow Scandal*, Salt Lake Tribune (Mar. 21,

2016), available at http://www.sltrib.com/home/3689548-155/utah-parole-board-41-million-still.

More importantly, there is no indication or allegation that the Mr. Jenson ever made any claims

of these claims between 2010 and 2012. Agent Nesbitt also fails to mention that Mr. Jenson

began making these allegations after he believes there was a threat on his life while in state

custody, or the fact that Mr. Jenson was desperate to leave incarceration.

## V.     AGENT NESBITT AND THE TASK FORCE USED FALSE STATEMENTS AND OMISSIONS RELATING TO JEREMY JOHNSON IN THE AFFIDAVITS.

| SWA 158 | AMENDED COMPLAINT |
| --- | --- |
| 59. According to campaign donation records, Jeremy Johnson, his business partners, and family members were political donors, having given more than $200,000 in campaign contributions to then Utah Attorney General Mark Shurtleff starting in 2008 while John Swallow served as Mark Shurtleff's lead fundraiser. Jeremy Johnson also supported charities and Attorney General's Office initiatives in which Mark Shurtleff was involved. Jeremy Johnson flew Mark Shurtleff on his private jet to a fundraiser in California. Photographs that can easily be found on the Internet show Jeremy Johnson and Mark Shurtleff sitting together in Jeremy Johnson's yellow Lamborghini sports car that is parked in front of a jet, Jeremy Johnson and Mark Shurtleff sitting together inside a jet, and Jeremy Johnson and Mark Shurtleff standing together in front of a helicopter. | 246.     Jeremy Johnson was a business man who owned an interest in a Utah business called iWorks. <br><br> 247.     The Utah Division of Consumer Protection launched an investigation of Jeremy Johnson and his business, iWorks in 2002 and 2003. <br><br> 248.     The Utah Division of Consumer Protection resolved its investigation into Jeremy Johnson and iWorks with settlement agreements dated October 1, 2003, and June 8, 2005. <br><br> 249.     In March, 2010, Jeremy Johnson became interested in an online poker project within the State of Utah. <br><br> 250.     Plaintiff and John Swallow had meetings |

with Jeremy Johnson and others to discuss the legalities of the online poker project.

251.    Plaintiff informed Mr. Johnson that he could not deem online poker legal in the State of Utah.

252.    John Swallow continued meeting with Jeremy Johnson and continued to attempt to arrange other meetings with other high-ranking officials.

253.    During 2010, Jeremy Johnson and his company, iWorks was under investigation by the Federal Trade Commission.

254.    On December 21, 2010, the Federal Trade Commission filed its civil Complaint against Jeremy Johnson in Nevada for marketing products using negative option continuity programs and on June 15, 2011, Johnson was indicted in Utah for mail fraud in the U.S. District Court for the District of Utah.

255.    Years before federal investigators pursued regulatory and criminal actions against Mr. Johnson, Plaintiff and Mr. Johnson participated in supporting two private charitable organizations: (1) the Utah Meth Cops Project, created by Plaintiff to offer treatment to police officers exposed to hazardous chemicals during drug raids; and (2) The Lost Boys, an organization that offers refuge to young men expelled by polygamist sects and living homeless.

256.    In addition, Mr. Johnson provided tens of thousands of dollars to Plaintiff's Internet Crimes Against Children Task Force. Throughout the affidavits, Defendant Nesbitt with the knowledge, assistance and support of Pickens and Isakson, and the encouragement, assistance, and at least the formal approval of Gill and others in his office, deliberately misrepresented fundraising or assistance with fundraising for the charitable projects as if they

were political campaign fundraising.

257.    Nesbitt with the knowledge, assistance, and support of Pickens and Isakson, and the encouragement, assistance, and the formal approval of Gill, and others in his office, deliberately misrepresented Plaintiffs' use of Johnson's home (the "Green House") and the aircraft belonging to Jeremy Johnson in February 2011, as bribery, despite the fact Johnson was not under investigation by the Division of Consumer Protection, the Office of Attorney General, or any other state regulatory agency.

258.    Gill, Nesbitt, Pickens and Isakson knew that Plaintiff never took any official act relating to Johnson, but omitted that fact from search warrant affidavits, the probable cause statement and the criminal information.

259.    The affidavits prepared sworn to and approved by Nesbitt, Pickens, and Isakson contain the clearly deliberate omission of a key piece of exculpatory information obtained in a SLCPCTF immunized interview with Mr. Johnson, in which Mr. Johnson stated: "[T]here was no quid pro quo with Mark Shurtleff."

260.    Despite the absence of any illegal, or even logical connection, said Defendants in the affidavits, probable cause statement and criminal charges continuously emphasize the relationship between Plaintiff and Mr. Johnson in a manner that is misleading and inaccurate.

261.    Nesbitt with the knowledge, assistance and support of Pickens and Isakson, and the encouragement, assistance, and the formal approval of Gill and others in his office, failed to provide any supporting evidence connecting Mr. Johnson to Plaintiff or of any improper conduct following his departure from office in any of their affidavits and declarations because none existed.

## VI.    AGENT NESBITT MISCHARACTERIZED THE BASIS OF THE STATE OF UTAH'S PARTICIPATION IN AND WITHDRAWAL FROM A PRIVATE CIVIL ACTION AGAINST BANK OF AMERICA.

| SWA 158 | AMENDED COMPLAINT |
|---|---|
| 86. In addition to being involved in the case against Marc Jenson, Timothy Bell had other significant involvement with the Utah Attorney General's Office. On or about March 16, 2011, Timothy and Jennifer Bell filed suit against Bank of America and Recon' Trust, a foreign corporation, in federal court challenging the foreclosure practices of Recon' Trust in the foreclosure of the Bells' residence located at 5346 South Cottonwood Lane in Holladay, Utah. The Bells argued that Bank of America and Recon' Trust acted as a trustee on their Utah trust deed in violation of Utah law. The defense's motion to dismiss was denied on March 15, 2012. | 265.    Throughout the affidavits Defendant Nesbitt, with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, intentionally used material misrepresentations and omissions to mislead the magistrate about the State of Utah's participation in Bell v. Countrywide Bank NA, a private civil suit pending in the United States District Court for the District of Utah from March 2011 to February 2013. |
| 90. On August 7, 2012, John Swallow and then Attorney General Mark Shurtleff met with the Bank of America attorneys and the bank's lobbyist to discuss the Bells' litigation. On August 10, 2012, John Swallow received an email from the lobbyist asking for the State's consent for an extension of time to file a response pleading. John Swallow forwarded the email to AAG Brian Farr, the division chief supervising the line attorneys in the Bell case and to Mark Shurtleff. On August 15, 2012, Bank of America requested the extension, and the Utah Attorney General's Office consented to the extension, The order to consent to the extension came from Mark Shurtleff and John Swallow. | 266.    This private action, which involved, among others, Countrywide Bank, N.A. d/b/a/ Bank of America ("BOA"), was originally filed in State court. It was removed to federal court on March 22, 2011.

267.    Defendant Nesbitt with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, either intentionally or recklessly attempted to create a negative inference from the fact that Plaintiff met with Countrywide representatives and then, two weeks later, an extension was granted to Countrywide. |
| 96. According to Mark Shurtleff's calendar, Mark Shurtleff had interviews with the law firm Troutman Sanders on October 30, 2012 and October 31, 2012 with the second interview occurring in Atlanta, Georgia. According to the website of Troutman Sanders "the Atlanta office is a full- service law practice and the world headquarters for Troutman Sanders LLP...The office has a large presence in Atlanta that includes, 13 stories in the Bank of America Plaza." According to the website of Troutman Sanders, Bank of America is client of the firm. | 268.    This case involved the foreclosure of a property owned by Timothy and Jennifer Bell.

269.    With Plaintiff's authorization, the Attorney General's office for the State of Utah intervened in that action seeking to prohibit Recon Trust, a Texas corporation without a place of business in the State, from conducting non-judicial foreclosures in Utah.

270.    During this time period, the Bells held a fundraiser for Deputy Attorney General John Swallow in their home (the home that was the subject of the foreclosure litigation.) |
| 97. On October 30, 2012, the Bells were accepted into a loan modification program with Bank of America | 271.    Plaintiff was unaware of the fundraiser until sometime later. |

they sought to obtain for several months. The modification came after contacting John Swallow and asking for his assistance on October 28, 2012. The Bells received a significant reduction in the loan principal and interest rate. The modification the Bells received entailed a $1.13 million reduction in their loan balance, and reduction of their interest rate from 7.5% to 2.65%. The modification did not affect the pending litigation on behalf of thousands of Utahns whose interests were being represented by the Utah Attorney General's Office.

99. According to text messages between Timothy Lawson, a personal friend of Mark Shurtleff and John Swallow, Mark Shurtleff told Timothy Lawson on November 14, 2012 "On my way to NYC in the morning. Getting close to accepting offer with national law firm".

102. On December 1, 2012, John Swallow advised the assigned AAG (Jerry Jensen) that he (Jerry Jensen) was no longer assigned the case. In and around December 2012, AAG Jerry Jensen attempted to plead the motion for summary judgment with then Attorney General Mark Shurtleff, advising Mark Shurtleff that he believed the case was strong and the State would prevail.

103. On December 17, 2012, an article was published in the news publication LawDragon that explained that Troutman Sanders announced that Mark Shurtleff will join the firm (Troutman Sanders) in January of 2013.

104. On or before December 19, 2012, then Attorney General Mark Shurtleff personally contacted the Bank of America lobbyist and told him the State would be dismissing its case. On December 27, 2012, then Attorney General Mark Shurtleff personally signed the State's dismissal of the case without contacting the line AAG, Jerry Jensen. Upon learning of the dismissal, the line AAG, Jerry Jensen contacted Mark Shurtleff wanting to know the reason the Attorney General had done so.

272.    During 2012, Plaintiff had already determined that he would not run for Attorney General again.

273.    During 2012, Plaintiff had interviewed with several prominent national law firms and had received job offers from three of them. Ultimately, Plaintiff accepted the offer from Troutman Sanders, an international law firm with headquarters in Atlanta, to work in the firm's Attorney General practice based in Washington DC. Troutman Sanders, like many large firms, happened to have Bank of America as one of hundreds of clients in the United States and internationally.

274.    As a result of open settlement negotiations, including an agreement by BOA to stop using its local Utah affiliate to process foreclosures (which was the fundamental basis for the State of Utah intervening in the first place), the Attorney General's office withdrew from the Bell litigation after Bell had separately negotiated his own settlement agreement.

275.    Count 7 of the Information alleges that Plaintiff somehow benefitted by receiving a job offer from Troutman Sanders after a series of events that involved John Swallow and the Bells and in the settlement and dismissal of a private Bank of America case in which the State had intervened.

276.    Misconstruing the import and scope of settlement negotiations in the Bell case, Agent Nesbitt with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, intentionally or recklessly attempted to create a false inference that the Attorney General's Office abandoned the legal interests of thousands of Utah citizens.

277.    However, the Attorney General's Office remained active in asserting the same arguments and interests in other cases pending before the federal district and circuit courts. Defendants Nesbitt, Pickens, Isakson, Gill, and the other County Defendants (John and Jane Does) had knowledge of these facts and intentionally and maliciously omitted them from the affidavits, probable cause statement and criminal charges.

278.    Defendant Nesbitt with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, intentionally and deliberately omitted from the affidavits, probable cause statement, and criminal information that the Attorney General's Office had completed the investigation into Bank of America two years before Mr. Bell filed his private civil action.

279.    Under Plaintiff's leadership, the Attorney General's office negotiated a nationwide settlement with the five largest banks, including Bank of America, which brought tens of millions of dollars to Utah homeowners and the State for the benefit of those who fell victim to anti-consumer practices. Those facts were also deliberately omitted from the affidavits.

280.    Defendant Nesbitt with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, failed to provide information to the magistrate related to the five cases in which the State continued to pursue the interests of homeowners.

281.    Defendant Nesbitt and the other Defendants purposely misrepresented and selected the Bank of America because they were aware of the Bank of America case and knew that they could cast aspersions on Plaintiff's reputation by mischaracterizing the information.

282.    Defendant Gill, authorized, directed and/or acquiesced to Nesbitt's application contained the false and misleading information.

283.    Defendants Nesbitt, Pickens, Isakson, and Gill had no information or evidence that Plaintiff's offer of employment on the "State Attorneys General Team" of a nationwide firm that represents hundreds of corporate clients bore any relation to the State's minor participation in the Bell litigation.

284.    Defendants did not interview attorneys at Troutman Sanders who would have fully debunked the false claim that the settlement of the Bell litigation had any relation whatsoever to Plaintiff's offer of employment.

285.    On January 3, 2013, a Salt Lake Tribune Article by Tom Harvey was published regarding Plaintiff and the dismissal of the Bell litigation.

286.    In drafting the affidavits for warrants, Defendant Nesbitt, with the knowledge, assistance, and support of Defendants Pickens and Isakson, and the encouragement, assistance, and the formal approval of Defendant Gill and others in his office, selectively used quotes from the newspaper article. Defendants deliberately withheld Plaintiff's quotes in that same newspaper story which were exculpatory and provided reasonable and lawful motives for his actions.

287.    Defendant Gill and the other County Defendants knew that Plaintiff's employment at Troutman Sanders was not related to the Bell litigation and yet maliciously and without probable cause brought a criminal charge against Plaintiff based upon supposition, innuendo, and an unsupported newspaper article.

288.    Prosecutor Defendant Gill, and others in his office should have never approved any search warrant affidavit or probable cause statement containing unverified and unconfirmed media stories and should not have brought a criminal charge against Plaintiff based upon such dubious information.

In addition to the forgoing, Agent Nesbitt knew or should have known Mr. Shurtleff's employment had nothing to do with Bank of America, because Agent Nesbitt had already contacted Troutman Sanders to discuss an investigative subpoena that had been served on the firm. Instead of conducting adequate research, Agent Nesbitt made reckless, uninformed, and inflammatory statements about Mr. Shurtleff's employment.  He also intentionally omitted the fact that attempts to resolve the matter through settlement pre-dated October 2012 and failed to inform the magistrate judge that, by December 2012, Assistant AG Jensen was no longer assigned to handle the motion, due to personal conflicts.

### VII.   DEFENDANTS KNEW THAT THE INFORMATION IN THE AFFIDAVITS WAS BASED ON INADEQUATE AND MISSING INFORMATION.

Plaintiffs adequately allege in the Amended Complaint that Defendants knew the information they were providing the magistrate judge through Defendant Nesbitt and SWA 158 was based upon inadequate and missing information and yet went forward, under oath, to obtain a search warrant.

<u>Amended Complaint</u>

321. The search warrant affidavit is peppered with a series of innocuous events surrounding Plaintiff's use of an aircraft and vehicle owned by Mark Jenson and his visit to Pelican Hills Resort at Tm Lawson's invitation. The Defendants never made the effort to investigate the circumstances surrounding those events.

322. Defendants took the image of those events and combined them with the testimony of someone that had failed to bribe Plaintiff—Mark Jenson.

323.  None of the transactions/events described in the search warrant affidavit provide any basis for probable cause for the search warrant.

324. Defendant Salt Lake District Attorney's Office, under the leadership, direction and guidance of Defendant Gill and with the assistance of Defendants FBI and SLCPCTF, and Defendants Utah DPS and SBI all had access to SLCPCTF files containing all of the evidence and provided oversight and assistance when Agent Nesbitt submitted intentionally and recklessly false statements in search and arrest warrant affidavits in an attempt to manufacture probable cause where none actually existed.

325. Defendants Salt Lake District Attorney's Office, Gill, FBI, SLCPCTF, Utah DPS and SBI intentionally false, inaccurate, and incomplete statements in the affidavits to secure a series of search warrants, the arrest warrant and the criminal Information filed against Plaintiff.

Plaintiffs have alleged sufficient facts that, taken as true, establish that Agent Nesbitt and members of the Task Force submitted a series of affidavits containing material omissions, misleading statements, and outright mistruths to the magistrate in order to secure a series of warrants to invade the private residence and private personal lives of Plaintiffs. Agent Nesbitt's

pattern of unlawful conduct and abuse of the judicial process not only offended principles of truth and fairness, but also resulted in a violation of Plaintiffs' constitutional rights under the Fourth Amendment of the United States Constitution, as articulated in *Franks v. Delaware*.

Understanding that *Franks* does not directly apply in this civil action, but the holding of the United States Supreme Court in that case offers some guidance in determining whether Defendants are protected by qualified immunity. In *Franks v. Delaware*, 438 U.S. 154, 169-170 (1978), the Court recognized that the *ex parte* nature of the warrant application process could lead to prosecutorial abuse. To  protect against this risk, the Court held than individuals are "entitled to use an evidentiary hearing to challenge the validity of a search warrant," if there is a preliminary showing that "(i) an affiant in an affidavit supporting a search warrant made a false statement intentionally, knowingly, or with reckless disregard for the truth, and (ii) the  affidavit is insufficient to support a finding of probable cause after the misstatement is set aside." *State v. Nielsen*, 727 P.2d 188, 191 (Utah 1986). If a court concludes the government procured a warrant through intentional or reckless false statements or material omissions, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the warrant." *Franks*, 438 U.S. at 155

The criminal case against Mr. Shurtleff was dismissed by the prosecutor, Troy Rawlings, prior to a ruling on Mr. Shurtleff's Franks motion. This Court has the opportunity to determine, de novo, and in the interest of justice, whether the search and arrest warrants should have been issued by the state magistrate judge, had that judge known of the false and misleading factual allegations contained in the warrant affidavits and all of the relevant facts intentionally omitted from the affidavits.

**CONCLUSION**

Plaintiffs respectfully request that this Court find that search and arrest warrants should not have been issued and that therefore the Defendants are not protected by qualified immunity and are subject to potential liability under Bivens and Section 1983. Plaintiffs argue that they have sufficiently alleged facts to so establish and have therefore also met the federal pleadings standard and should have the opportunity to prove their case before the trier of fact in this Court.

For the reasons set forth herein, the Defendants' Motions to Dismiss should be denied. Dated this 16th day of September 2019.

SHURTLEFF LAW FIRM

*/s/  Mark L. Shurtleff*_____
MARK L. SHURTLEFF
ATTORNEY FOR PLAINTIFFS